**Akhil PATEL, Appellant**

v.

**Nadia HUSSAIN, Appellee**

**NO. 14-14-00459-CV**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed January 21, 2016

Tej Paranjpe, Houston, TX, for Appellant.

Joseph Mathew, Houston, TX, Matthew Joseph Kita, Houston, TX, for Appellee.

Panel consists of Justices Jamison, McCally, and Wise

## OPINION

Sharon McCally, Justice

This appeal follows a plaintiff's jury verdict in a "revenge porn" case.[1] Specifically, appellee Nadia Hussain sued appellant Akhil Patel, alleging that after the couple broke up, Patel hounded her with a slew of offensive and threatening communications, hacked or attempted to hack her accounts, and posted secretly recorded sexual videos of Nadia on the Internet. The jury found in Nadia's favor on her claims for intentional infliction of emotional distress (IIED), intrusion on seclusion, public disclosure of private facts, and defamation. The jury awarded her damages totaling $500,000, including past and future mental anguish damages, past and future reputa-

---

1. "Revenge porn" is popularly understood as nonconsensual pornography: "the distribution of sexually graphic images of individuals without their consent," including "images consensually given to an intimate partner who later distributes them without consent," and "images originally obtained without consent," such as hidden recordings. Danielle Keats Citron & Mary Anne Franks, *Criminalizing Revenge Porn*, 49 Wake Forest L. Rev. 345, 346 & n.10 (2014); *see also Rauhauser v. McGibney*, —— S.W.3d ——, No. 02–14– 00215–CV, 2014 WL 6996819, at *5 n. 5 (Tex. App.—Fort Worth Dec. 11, 2014, no pet.) (describing a revenge porn website as one "where disgruntled exes upload naked and sexually explicit photos of their former paramours"); *GoDaddy.com, LLC v. Toups*, 429 S.W.3d 752, 753 (Tex.App.—Beaumont 2014, pet. denied) (noting allegation that a revenge porn website "published sexually explicit photographs of plaintiffs without their permission or consent").

tion damages, and exemplary damages. The trial court signed a final judgment for $500,000 in damages and a permanent injunction.

On appeal, Patel does not challenge the evidence supporting the liability allegations. Instead, in six issues, Patel contends the trial court erred by (1) denying his motion for JNOV on the defamation claim because the jury found that the publication was substantially true; (2) denying his motion for JNOV because the trial court's judgment violated the one-satisfaction rule; (3) awarding damages attributable to Nadia's claim for IIED because this "gap filler" tort was unavailable in the context of this case; (4) awarding mental anguish damages in the judgment because Nadia's stipulation concerning her social media posts established that Nadia did not have a substantial disruption to her daily routine; (5) awarding mental anguish damages because the evidence is legally and factually insufficient; and (6) awarding exemplary damages when the evidence is legally and factually insufficient to support mental anguish damages

We sustain Patel's first and third issues and overrule the others. Thus, we modify the trial court's judgment to remove the damages associated with the defamation and IIED claims and affirm the judgment as modified, resulting in a judgment of $345,000.

## I. BACKGROUND [2]

### A. The Relationship, Pictures, and Videos

Nadia and Patel began a relationship in high school and had an "on-and-off" dating relationship for about seven years. Nadia is Muslim and Patel is Hindu, which caused difficulties during the relationship. They broke up in late 2010. During the relationship, Nadia emailed several pictures of herself to Patel that showed her topless and wearing only underwear. Nadia asked Patel to delete the pictures after she sent them. He didn't. Also during the relationship, Patel recorded videos of Skype (video chat) conversations during which Nadia undressed herself and masturbated. Nadia did not consent to being recorded.[3]

### B. Patel's Frequent Contact and Threats

Patel continued to contact Nadia after they broke up despite Nadia and her mother, Sakina, telling him to stop in December 2010. At first, Nadia engaged Patel. Patel's father emailed Nadia in April 2011, asking her to "Please send him a message telling him he has to move on with his life and to leave you alone otherwise you will have to call the authorities for st[al]king you." Patel sent Nadia text messages in July 2011 because he wanted to talk with her. She did not respond to most of his text messages. The trial court admitted screenshots of the text messages into evidence, including the following from early July:[4]

> Patel: Retaliation ..... you think this is retaliation? ? ? ? ? ? ? Haha retaliation woulda been something totally diff nadia but, THINK back you fuckin genius did I? ? ?

---

**2.** We state the facts in the light most favorable to the jury verdict in accordance with the standard of review outlined below. We also set forth the background in substantial detail as Patel challenges the evidence to support the damage awards.

**3.** The parties disputed whether Nadia was aware she was being recorded.

**4.** Some messages have been omitted from the ones quoted in this opinion. Ellipses appear in the original unless contained within brackets.

Patel: I'm going to give you until 6pm to come up with a better response nadia.

Nadia: OR WHAT AKHIL

Patel: Hahha look how quick u respond when you FEEL like ur gonna get hurt ... do you care about huring me hahahha NOPE.!

Patel: Or what ....... ? ? ? ? Hahah nadia think about it ..... like I said 6pm to give a better response.

Patel: Do you hold back from anything when you talk to me or the way you act with me ..... NO, why do you EXPECT ME TO DO THE SAME NADIA? ? ? ? HUH WHY? ? ? ?

Patel: Times up!

Patel: I hope you are happy now!

Patel: You have never given me a chance ..... and I have given you numerous, times up for you ..... like I said in the car rmr those words.

Patel: [Link to a YouTube video]

Patel: Em going to give you until 630pm to come up with a better response nadia.

Patel: It's privatized nadia.

Patel: What now u amt gonna respond or what? ? ?

Patel: You know what fuck it .......

Patel: If officially lost you right .... what do I have to lose ....

Patel: I'm tired of being ur bitch all the time ....haha all I wanted was to be fine ....this is gonna help you cause this is ur health, thank me later.

Patel: [Link to a YouTube video]

Patel: That's the legit link .... I gave u a chance and u decided to treat me like a dog

Patel: And if that didn't work .... check ur email .... o wait u prolly have all my emails blocked hahah even tho I barely email you hahahah-hahahahah

Patel: Hahahhahaah you don't have to be like this anymore. Your done.

Patel: And we both know what's gonna happen now ...... right? ? ? ? ? ?

Patel: Family will· be very ashamed .......

Patel: You could have prevented this, that's what's FUCKING FUNNY. You didn't fuckin get what I asked for and u acted in an inappropriate way.

Patel: Stop crying in ur room nadia you had to think at one point you treating me like this was gonna back fire hahha and yet still ur video is private you want me to send it to your mom? ? ? ? FUCKING AN-SWER ME NADIA?

Patel: Don't worry like I said only people with the link can view it!! Hahah

Patel: [Link to a YouTube video]

Patel: [Link to a YouTube video]

Patel: That's the least of your worries

Patel: U need to learn how to respect people and stop hanging up on people.

Patel: You still have a chance nadia just FYI.

Patel: Unlike you, regardless of how you treat me .... I still wanna give you a chance and not say anything to your mom

Patel: [Link to YouTube video]

Patel: Ya and those pics u sent me too gotta see if the google techs can rwcover those too .... so you can post those too!! So than again more guys! For you that's what you wanted right to go thru a bunch of guys!! You warm up to them easily ..... hahah but can't talk to a guy that uve known for 7 years ... and were in a relationship and wanted to marry and start a family with .... again u said the above text that's why I'm say in

this to you ....jus hurts that u ignore.

Patel: YES! According to a guy I know from UT who works at google, they can recover it ... it'll take a couple of days, but then I can give it to you so whenever u go on ur date you can give it to him

Patel: Look how much fun I can have with your family ... esp since I know all of them, and ur couz like me and think I'm good for you .... [link to YouTube video]

Patel: You have until Saturday.

The text messages continued a few weeks later:

Patel: No nadia its done ...... I'm sick and tired of how you treat me.

Patel: I knew you would do this to me which is why I went and got my laptop fixed .... my gut told me that once you know that my laptop was fucked up and that I deleted those pics ... ud disrespect me.

Patel: Best buy fixed my laptop in fact and restored everything. Nadia. It took you 5 days to respond to me asking if you needed space. Nadia I'm not a dumbass, your mom told me you were busy so you might not have texted for that reason. Nadia you prolly text and call people on the norm, but no not akhil for what? ? ? ? You don't know nadia. I'm tired of you disrespecting me.

Patel: Stuff I say, yes nadia everyone says stuff out of frustration even you. I just miss you and miss talking about random stuff and having fun! Ill give you space

Nadia: I don't go to the extent of retrieving life threatening information just to threaten.

Patel: I didn't.

Patel: I didn't even threaten you that's the funny thing.

Patel continued a few days later:

Patel: I'm fucking done. Treat me like shit. Continue it.

Patel: U don't tell ur mom shit on how u treat me, but ur mom thinks I'm some horrible person.

Patel: Go watch ur video and know that I have it all 30 min of it

Patel: And now I'm gonna mess with you just like you messed with me, and rmr this, your friends say a lot

Patel: And now I have found the website, *xvideos.com.* I will send the link later tonight.[5]

Patel: [Link to YouTube video]

Patel: Already on youtube ... and it has 2 views!

Patel: Congrats uve fucked ur own life up and best believe imma email ph tomorrow with the email along with those other videos of you.[6]

Patel: Hahahahhahahahahha you FUCKED UP NADIA BIG TIME.

Patel: You ignoring me like I just told your mom is the worst thing you can do.

Patel: Aight imma see you on Sunday that's cool!

Patel: And I know where ph is that's cool! Call the cops I haven't done anything

Patel: [email address for Nadia's grandfather]. don't worry I got you.

---

5. Patel testified that he did not know what kind of website xvideos.com was and he had never visited it. Patel testified that he would be surprised to know that xvideos.com is a pornographic website because he has never visited a pornographic website.

6. Patel testified that "PH" was where Nadia worked at the time.

Patel: I haven't done anything! Hahhahah trust me keep messin with me

Patel: Hahha I'm with ronak and rajiv .... and they said u deleted them!? ? ?[7]

Patel: On facebook hahahhaa ur soo wack I jus showed them ur video.

Nadia responded a few days later and told Patel she was "tired of being scared" of him. The messages continued:

Patel: Who's scared?

Patel: Obv you amt cause nadia what THE FUCK DON'T YOU GET DUMMY

Patel: WHY THE FUCK CAN'T YOU BE NICE TO ME FOR ONCE SHIT!!? ? ? ? ? ?

Patel; So either way imma lose you.... ? ? ? ? When I have done nothing to you .... but no its ok for you TO HURT ME THAT'S FINE, BUT IF I SAY ANYTHING, ILL LOSE YOU NO MATTER WHAT, HOW IS THAT FAIR? ? ? ? ?

Patel: Lol i've already apologized to you, yet you haven't all you do is continue to push me, push me to do something towards you so you have a reason to say "you lost me" like I don't get why the fuck you do this, this is your life and mine, yet u think it's a fucking game.

Patel: If you can't pick up the damn phone then at least text nadia shit

Patel: And I'm tired of bending over backwards and always following you, when all I fuckin wanted was to talk fine...... why are you making this so fuckin hard? ? ?

Nadia: We can't be fine!!

Patel: And don't lie you know u arnt scared, why would you be scard considerin if never done anything.

Patel: Hahah ya we can but you won't let us!! Cause you think I have some plan under my sleeve nadia what don't you fucking get

Patel: Every good convo we have, you fucking ruin it for no reason

Patel: Its ur fault what don't you get smart girl!? ?

Patel: Think about that for once and you will see that I'm right. You don't ever have to ignore someone like you do to me.

Patel: And what are u givin me options?!

Patel: What do you get out of this? ? ?

Nadia: What do you get out of threatening me?

Patel: Who did that?

Nadia: I know why I ignore you you scare the shit out of me why would I want to be friends with someone who does that to me?

Patel ultimately apologized for saying "a lot of messed up things to you that I shouldn't have," acknowledged that he "fucked up" and "said so much shit," and claimed he would never hurt her and was only talking out of frustration. The conversation turned to the video recordings:

Nadia: You recorded me akhil..without my consent, do you know how bad that is? And in top of that you threaten to expose me with it? ?

Patel: Recorded you, you act like I did it on purpose, I recorded you smoking yes. But it recorded everything on my comp not just you nadia. I've gotten worse? ? ? How have I, I've done nothing to you, I said stuff

---

7. Rajiv had been a mutual friend of Patel and Nadia's. Ronak was Patel's cousin. Rajiv testified at trial that Patel told them that Patel had pictures and videos of Nadia.

jus outta anger because of how you treat me.

Patel: Have I exposed you?

Patel: Those videos were taken when we were together, when you said you were faithful, and you were not.

Patel continued with a barrage of texts for days, telling Nadia that she was rude, disrespecting him, and causing the problems. He also sent her a list of email addresses for people who she knew with the message, "You know what step two is." He continued:

Patel: You keep on hurting me and I will build up a list. What I am asking for isn't hard to do or give. You are making it like that for no reason.

Patel: As you sit there laughing at me nadia, I just laugh harder knowing what I have. The choice is yours.

Nadia repeatedly asked to be left alone, but Patel continued to contact her. He resumed texting her at the beginning of August, including these among other messages:

Patel: I am trying to be nice but you are taking it too far nadia. If you tell me things maybe than Ill know what to do. Like you get so scared about ur pics and vids and emails but I didn't do anything cause I don't want to. You make me. And you don't have to, as long as you stop ignoring me and just tell me something damn nadia.

Patel: And if you really piss me off nadia chris Charles is going to look at you in a whole new way. N so will owais, prolly never thought he would see that side of u [8]

Patel: But you can all make this go away and Ill never bring anything up and Ill in fact just delete everything if you jus stop ignoring me.

Patel: You know what, I've "lost" you anyways right? So screw it. [Link to YouTube video]

Patel: When someone texts you, esp if the supposedly have your life in their possession, why would you ignore them? ?. ? See you ask for this, what did I do so wrong to you nadia? ?

Patel: What the fuck is wrong with you?!?

About a week later, there were more texts over several days:

Patel: You can run away from my texts all you want, but people arnt going to run away from their emails. . . . . . you keep pushing me to be like you, one day I WILL!

Patel: You are going to ruin your mothers bday for no reason.

Patel: Tomorrow owais is going to see your boobs!

Patel: And ali q and sahir waseem.[9]

Patel: [unidentified email address]

Patel: [unidentified email address with "waseem" in the address]

Patel: I supposedly have ur life in my hands and u still treated me like crap!

Around the time that Patel was sending Nadia these messages, Patel visited her workplace. He would call her there, as well, on the business's only telephone line. He also had flowers delivered to her.

Patel sent Nadia an email on October 1, 2011:

So we both know this will never turn out good if you continue to act like this

---

8. Patel testified that he believed Charles was Nadia's coworker. Charles testified at trial. Patel also testified that Owais was Nadia's friend.

9. Patel testified that Ali Q was Nadia's friend and Sahir Waseem was Nadia's uncle.

nadia. [...] all of this is your fault!!! You are hurting your own mothers health by your antics, i just hope you know that. [...] July 31st you wanted to act like a hardass and tell me whatever you wanted to tell me. But as soon as i say something along the lines of returning the favor back to you, you throw a fit, delete me off of facebook, get an app that blocks my numbers, and so on. All that does is add more fuel to the fire and I am glad you are doing that. I already gave your mom a date when i feel like I will be fed up with all this. Unlike you, I don't listen to my friends even though they say to go ahead and send whatever you need to, teach her a lesson, and then get it over with. You listen to your friends when they tell you to jump [...] you went out and had fun with everyone, neda and ali q. Since they are your GREATEST friends nadia i will be sure to let them know whats going on as well. You are the only one that can stop all of this, by just being a better person and actually communicating with me. You know you are wrong in doing this but yet you still do it. [...] Before all this picture/video stuff came out you ignored me for now reason during December and on my own FREAKING BIRTHDAY!!!! and then you make it seem like you didn't do antying wrong, but nadia we both know you could have handled that situation a lot differently and maybe we wouldn't be in this damn mess. Its time you are held accountable for your actions.

Patel texted Nadia again over the course of several days in late October 2011:

Patel: [....] I do have your nana n nani's number, you really don't know how bad I just want to text them those pics and stuff, WHY THE FUCK CANT YOU JUST REPLY SO WE CAN END THIS!!!!!? ? ! ? ! ? ! ? ! ?[10]

Patel: YOU HAVE HURT ME SOO MUCH NADIA. DO I want to RUIN YOUR REP!!!! yes i do very much so, prolly because im frustrated, but will i do

Patel: All I want is some kind of response, if I don't get that at least, even a single "A", imma act like you IMMATURE and send stuff to spite/hurt you cause you love to hurt me soo much so I guess I will return the favor, im tired of being hurt by you

Patel: thanks for nana n nanis number, they will get involved now too since you cant MAN UP to your decisions, they get pic msgs nadia

Patel: Go and hide behind ur phone, you will see me one day either I will come to ph or at talhas wedding and don't make any faces to me then cause ill get on the dj's comp and play ur video.[11]

Patel: You tell your mom about the videos? ? What about nana or uncle or co workers like Rachel? ? ? ?

Patel: Oh ya nadia I have something far more valuable of yours than those stupid pics

Patel: I sent that to chris and amanda, I'm sorry it had to come to this. Hope you don't get fired.[12]

Patel: Ahh yes and your father, I have his contact info as well nadia, I know

**10.** Patel testified that "nana and nani" were Nadia's grandparents.

**11.** Patel testified that Talha was a mutual friend. Patel attended the wedding. Nadia did not.

**12.** Patel testified that Chris was Nadia's coworker. Patel testified that he did not know who Amanda was.

you don't really care for him too much but still.

Patel: [. . . .] I'm going to make sure each one of your family members knows about those pics n vids and when I say family I mean nana nani mom uncle bhabi dad [13]

Patel: [ . . . .] wisen up, or learn a lesson the hard way. I have nanas email and his cell phone. Along with nanis phone. I could jus mail the pics to the house if that's what you want!?

Patel: Just sent you and your mom that pic [14]

Patel: I'm glad you don't worry about your nana or nani

Patel: I'm going to call your work again until you realize you cant treat people like this!

Patel texted Nadia again, during the middle of the night, over the course of several days in January 2012:

Patel: Like I told you earlier and just now. I asked for something simple. You are asking me to come to PH you know that . . . . . ? ? ? ?

Patel: You fucked up . . . . . . and now, not me, you will pay the price because I've been nice

Patel: Tomorrow your mom is going to find out what you did.

Patel: And so is your nana nani and uncle

Patel: I would say a lot to you . . . but imma wait . . . . and let your mom nana nani uncle and bhabi know what you have done.

13. Patel testified "bhabi" is Nadia's aunt.

14. The record includes Exhibit D6—a copy of an email Patel sent to Nadia and her mother one minute before this text message. The subject line is "The beginning." It includes an attachment of one the revealing pictures that Nadia sent to Patel during their relationship.

Patel: You think you are sooo smart . . . wait until tomorrow. Confess to ur nana then nadia. Tired of ur shit

Patel: Your mom nana etc need to realize how rude of a person you are.

Patel: Your action or lack thereof will cause/determine my reaction.

## C. Continued Harassment, Uploading the Video, and Hacking

In January and February 2012, Nadia started receiving text messages from unknown and unverified numbers. Nadia believed the texts were from Patel [15] and that Patel had been discovering information about her whereabouts, purchases, and activities based on texts such as these:

Patel: Hurd u like bangin texmex guys! Lmfao

Patel: juz cuz u got caught wit the texmex

Patel: i c u! sittin near da door ill come say hi in a bit.

Patel: stp rackin up shi on the credit gurl! debt getting hi:=(

Patel: howz da new spot gurl!?

Patel: howz da new i4!?!?!?! ? gud recep with vzn? lmfao [16]

In February 2012, Nadia began receiving emails from her email service provider stating that she had been trying to recover her account password, although she had not been doing so. The emails came almost every other week. Nadia filed a police report on March 8, 2012, to report Patel's harassing conduct and possible

15. Patel denied sending the unverified text messages, but the jury was free to disbelieve him. The trial court admitted screenshots of the text messages into evidence at the conclusion of the trial.

16. Nadia had changed her cell phone service to Verizon to try to prevent Patel from contacting her on her cell phone.

breach of computer security. She reported that she received upwards of 20 to 30 text messages and phone calls per day.

Nadia lived with her grandparents and mother, Sakina, at the time. Sakina testified that Patel would prank call the house multiple times per day at all hours, including 1:00 a.m. and 2:00 a.m. He did this for several years. They would have to leave the phone off the hook at night and block his calls. Nadia testified that she changed her phone number multiple times, but Patel kept discovering it and contacting her. She put an application on her phone that would only allow certain contacts to reach her, but she believed Patel was impersonating her contacts, calling her, and hanging up.[17]

Police officers spoke with Patel in March 2012 and told him to stop contacting Nadia. He didn't. Shortly after the police spoke with him, he emailed Sakina:

[...] This week coming up its nadias birthday. Since you and her think its funny that calling the cops on someone for your own problems when they have nothing to do with it, will somehow solve them, I will let you two go ahead and think like that. You seem to be a very smart woman, so you should be able to anticipate what my gift to nadia will be this year! [18] You can relay the information to her as well that before she laughs at the fact that she called the cops on an innocent person she may want to remember what she has put out there. [...] Similar to what both of y'all did, getting my family and friends as well as me involved into your own

lifes problems, she should anticipate hers getting involved to, all thanks to y'alls decision to try and ruin my life.

Then, Patel uploaded Nadia's videos to the Internet.[19] The trial court admitted print-outs from a pornographic website showing Nadia's videos on the Internet with the title "Pakistani Nadia Houston."[20] The text messages continued from March 2012 through August 2012:

Patel: Your vid is up online. Congrats to you and your family . . . . over 2000 ppl have viewed what you do in your bed.

Patel: You seem to be very popular amongst the guys, they can't stop watching you! 5000 views with your name on it!

Patel: Who knew your pictures an videos would draw such a big audience? Not only did 5000 men and women watch you, 300 downloaded your videos!

Patel: All I asked for was respect and you couldn't do that 9 months–1 year ago. You listened to your friends rather than be nice. . . .

Patel: The biggest question is what kind of explanation are you going to have for nana and nani oh ya and mamu-jaan? You should think about all that

Patel: Especially when they find out via email/social media/etc . . . they will be heartbroken. . . . . . man that'll so sad :( . . . . .

Patel: Blame yourself and your attitude for everything that is happening.

---

17. Nadia testified that she would receive calls frequently from her contacts, and she would pick up, but there would be no one there. She asked her contacts if they had called her, and they said they did not.

18. Sakina testified that, based on prior conversations, she understood the "gift" would

be Patel sending out Nadia's videos and pictures to people.

19. Patel denied uploading the video. The jury was free to disbelieve him.

20. One of the videos had received nearly 5,000 views by February 2013.

Patel: Your "im invincible" attitude is what brings pain, shame, and disrespect to your family nadia. YOUR VIDEOS AND PICS BRING ALL THAT.

Patel: Why do you insist on trying to ruin my life? ? Ive sent nothing out yet you try and ruin everything ive worked hard for in my life

Patel: You got the wrong people involved, ur shit is still out there, and you and ur moms lies and bs are the reason gp is going to get some mail.

Patel: [Link to xxxvideos website with "nadiah" in the link address]

Patel: (your video on youtube) [Link to YouTube video]

Patel: [Link to YouTube video] Can't wait to hear what nana/nani/razamamu/bhabi think of this . . . .gonna be epic

Patel: How did you like your video? ? Ready for rd 2? ? That's when they get good . . . . . those are some that the fam has got to see!!:) raza!!

Patel: [email address for employee at Nadia's employer] wow! This is gonna be great cannot wait to see wht Monday has to bring! Coworkers getting a lil peep:)

Patel: as much as you may not want to belief it . . . .we BOTH get off on the fact that we hurt each other a lot . . . .we both know what we are Doing is hurting the other person . . . yet we continue to do it. [ . . . ]

Patel: The movies are where your shit gets exposed, when your nana finds the pcitures in the mail . . . .you know he is going to disown you . . . ifthekar!

Patel: Hmm my video on youtube is down . . . so that mustbe because of you . . . now I'm going to make sure you live the life uve made me live . . . have fun

Patel: Your family friends and other ppl in your life are gonna see your naked videos . . . they are on the internet already, beat of my own drum F U!

Patel: that it will B posted, I CU told youtube 2 take down YR video, that will cont. nadia. I don't have respect 4 U and YR mom be of how u both have treated me, but yet for some reason i still care. You made a big mistake a year ago . . . .ive dealt with the pain, which has made me want to send something just to spite you. So jus accept that this is never going to go away nadia

Patel: And you better expect that, that particular individual, you know I'm referring too will be getting your fuckin videos and pics nadia.

Patel: You may want to try and get home early to check the mail . . . . . pictures and dvd are in the mail. Being patient with you has come to an end.

Patel: And run thru to your mamus house to . . . he was added to the mailing list too.you crosse dht eline with what you did. beat of my own drum FUCK YOU

Patel: I would check the mailbox and the windshields of ur cars . . . .may start putting your naked pictures in/on them hahaha and ur uncles house too

Patel: You want this to end? ? Then keep the promise . . . and you know how to get in touch with me . . . . .

Patel: Hope you have a good weekend and good next week!;) would hate to miss what the bbb finds out! Ur in trouble

Patel: Get ready this week, its going down . . . .now you will see why "this is happening" and ur not going to like it. Neither is ur mom

Patel: Don't try and hide ... I told you ill get all those files to that particular person and we both know who I'm talkin about and what ur doing!

Patel: You ready!?! We are the same people its too carzy ....just like you, hurting others is just in our nature

Patel: You arnt that slick nadia ..... its going to happen, don't let this break fool you, you will receive the same you dished to me believe that.

Patel: I can'twait to ruin ur life with ur fucking naked pics and videos....[Nadia's work email address] or w/e I'mdef gonna send it u fucking bitch

Patel: [Link to YouTube video] here you go just found this on the tube!

Patel: Curious to see what Mr. Hussain thinks about that as well ..... [phone number] ·

Patel: And your mother ... she should see what you send guys in the past and the present and future ....you love showing guys your naked body huh!!? ?

Patel: I notice uve seen ur video like 5 times ....don't tell youtube ....you asked for this Nadia Hussain, I tried to be civil with you but no ...

Patel: One way or another people are going to see the pics/videos don'tmake this harder for you your fam and that individual, you shamed ur family.

Patel: Can't wait to see ur reaction at fpsf

Patel: [Link to YouTube video] that would be weird if chris and Amanda go this ... or even cnj

Patel: Can't stop SOCIAL MEDIA!! Nice complaint btw. I see u are very proactive in protecting your image, bring shame to ur fam for ur friends lol

Patel: Have fun this weekend ....this is what u get for causing me soo much pain ... [two phone numbers] u screwed up nadia, you love to get naked.

Patel: Stop messing with the youtube videos, people wnt to see this stuff. 1900 ppl viewed the entire video, maybe its time to upload again nadia!:)

Patel: Good morning! I hope your having a swell day! Your video is up on youtube again, just gotta search for it, thnk bout wat u did n ull find it

Patel: [image]

Patel: Attachment(s) photo.jpg removed

Patel: Attachment(s) photo.jpg removedf.] Next one to nana

Patel: (:)) Have fun this weekend! You like this so I will too! You get happy hurting me ...... so I've grown into the same person. You try and hide it all but its th

Patel: You should def google ur name ... some interesting stuff I.e. videos come up! This is me telling u, ur videos are online not youtube!:)

Patel: The great thing about the element of surprise is knowing you will never know when your nana will receive your pics and videos!:)

Patel: Now that I have ur attention ... I wouldn't do anything dumb, its already off! You need to live up to ur end of the deal.@

Patel: You the pictures? FUCK YOU! Lol

Patel: Got EM hahahah

Patel: 02/02:,mp4 on your mobile

Patel: 01/02:Download softcore nadia hussain Houston texas for ... *www. adultwave.mobl/videos-nadia-hussa* ... download softcore nadia hussain Houston texas for free 3gp

In November 2012, Nadia's Apple ID password was changed, and the notification email was addressed to "Akhil Patel." She did not change the password. The text messages resumed in November 2012 and continued through March 2013:

Patel: You've been exposed live with it, it's your fault that everyone has seen you. Blame yourself not others. You did it.

Patel: Whatever you didn't want exposed was. You wanted to become famous. Now you are an Internet sensation! Hope you're happy!

Patel: Lol it's funny to think that you have fun even though there are naked videos of you posted for everyone to see!!!!! Fuck you!

Patel: What is the difference between you and a porn star? ? ? ....hint:ends in "thing", yup you got it.NOTHING!!:) hope your fam is proud

Patel: Sorry, but you have brought this upon yourself. When you go back to your apt your nana n nani will get your pictures/videos.

Patel: your videos are on the laptops at the apple store in the galleria FYI

Patel: You called me?

Patel: If you have something to say then just say it. No need to call me.

Patel: You can just text me your nonsense. Go to the apple store galleria asap!

Patel: Just FYI again do not delay, alot of people go to that store that you possibly know.

Patel: Especially people from work.

Patel: I hope you went to the apple store. Your attitude was your biggest weakness and now that has translated in being your mistake!!!

Patel: Mistake= you and your family being humiliated. Accept that you have been seen by everyone, embrace it, it's still out there

Patel: Check the mail either today or tomorrow! Your naked pictures are on the way!!

Patel: [nine-digit number]

Patel: Looking back at your actions and emails, u should realize why everything has happened and it'll continue You made ur own life hell

Patel: Your video is on Spankwire again. Just FYI

Patel: 2013 is going to be so much worse than 2012. The Internet is huge you will never find out where it's posted. Fam is goin to suffer

Patel: I should have put your naked pictures on your car and the other cars outside the house tonight. You can let nana find them!!!

Patel: 7 more days!!! Then you and sakina will know never to talk shit. 2013>2012!! Nana will be in the know!! [the nine-digit number from earlier text]

Patel: The video was a hit, how do you feel superstar [ . . . ]

Patel: Must be a weird feeling knowing that your friends and people you know have seen you naked and playing with yourself huh?!?:)

Patel: I just a disturbing video of you, what is going on.

Patel: You are fucked. I got the number and now it's on. I can't wait to see the look on your dumbass face when you hear what was sent.

Patel: Get ready ..... its all coming!!!! :) —> :( for you and your family!

Patel: Fuck you, I love when you are hurt. I am going to post your videos online, 50k hits should be easy to hit. BITCH!!

Patel: wanted 2 do this 4 a long time and now I will. I have YR family's email along W YR apartment address. FUCK U WHORE

Patel: email going out this Sunday to [sakina's email address] and to raza with your videos you will never live this down ... hows life now!!?!?

Patel: [nine-digit number] and [nine-digit number from earlier texts] SS#[21]

Meanwhile in February 2013, Nadia received multiple texts from Verizon indicating that her password had been reset, although she did not reset it. Nadia testified that she would get "constant messages—I mean every day—that my passwords were changed." Ultimately she put restrictions on her Verizon account so no changes could be made unless she went into a store and presented identification. She also testified that she "would get credit inquiries often—cards, you know, saying that I opened an account or that I attempted to."

Nadia sued Patel in March 2013. She stopped receiving the communications from Patel and the password-reset notifications at that time.

## D. Nadia's Mental Anguish

Nadia testified that when Patel told her he had her videos, she felt devastated and horrified. She was scared of Patel, and she did not know who to talk to or where to turn. She testified about how her life has been affected since the videos were uploaded:

It's humiliating. I don't—I don't know who has seen these videos. I don't know—I'm scared of who has seen them. There is no way of me knowing. I feel like I can't face anyone. It's humiliating.

. . . .

Again I don't—I don't know if someone's interested in me because they have seen these videos. I don't know what they will feel like if they come across these after awhile.

. . . .

Again I don't know who I can face. I don't know who has seen these. I don't know what they are talking about.

. . . .

It was traumatizing. I didn't know what I—I didn't know what I could do. . . . I didn't want to face anyone. I thought of me literally moving and telling my mom my number just so she could contact me.

. . . .

It was bad. I mean, that was bad. The threats were bad. I was—it was before that where—there was a point where I just wanted to give up.

Nadia testified that she never told her grandparents the full extent of what happened because it was embarrassing. Nadia testified that she "felt like a liability" living at home with her mother and grandparents because Patel kept calling the house frequently in the middle of the night. They would have to take the phone off the hook. And she testified that she "wanted to take [herself] out of that situation." So she moved into an apartment of her own. She testified about the apartment:

I chose an apartment with burglar bars. I put things in front of my window sill. I never open my blinds. I'm just—I don't know what—I don't know what he is capable of doing. I'm scared all the time.

She testified that she had the owner of the apartment install an additional lock.

**21.** Nadia testified that Patel sent her and Sakina's social security numbers.

As a result of the constant contact from Patel and her account passwords being changed, Nadia felt like she had no privacy and she "couldn't get away from him." When asked how it would affect her future, Nadia testified:

> Again I don't know—like if I were to date, I don't know if this person is interested in me because they have seen my video. I don't know what they will feel if they know this. I don't know if I can trust anyone again.

Nadia also expressed concern about an employer declining to hire her because of her videos: "Because again all they have to do is Google my name. What if that prevents me from getting a job." She testified she thought an employer would not hire her because of the nature of the videos and the websites that they are on.[22]

Nadia testified that she had "not really" seen a therapist for her mental anguish, but she saw a "licensed professional" a couple of times shortly before trial. She did not see one earlier because she was embarrassed and because she could not afford it. Nadia testified that she missed about five days of work as a result of the ordeal.

Sakina testified about how she would hear Nadia crying in her room while talking on the phone. Over time, Nadia went from crying to screaming. When Sakina confronted Nadia about it, Nadia was shaking and could only talk in between crying. Nadia was embarrassed. Because of Patel's threats, Sakina was in fear for Nadia's life "[a]ll the time." Sakina testified that as a result of the ordeal, Nadia suffered from a loss of confidence: "she was not even a fraction as confident as she always was."

In the fall of 2012, Nadia took off work for a few days to stay with a close friend, Ana Chowdhry, in Huntsville. Nadia was afraid to be by herself. Chowdhry testified that Nadia did not feel safe in her own home because Patel knew where she lived and had come there looking for her. Chowdhry testified that Nadia "changed a lot" as a result of the situation with Patel. Now, Nadia "would just look like she is nervous all the time." Nadia used to be more involved in the Muslim community, but since the situation in 2011 and 2012, she has become less involved. Chowdhry testified that all of their mutual friends, everyone who knew both Chowdhry and Nadia, were talking about Nadia's video. Chowdhry explained that the release of the video ruined or affected Nadia's reputation within the Muslim community because in their community, "[y]ou have to be extra careful about what you do in front of people." Because people were finding out about the videos—"something so embarrassing"—it was "hard for her and people thought things."

Another one of Nadia's close friends, Rabiya Jahved, testified that Nadia stayed overnight a few times with Jahved because Nadia was "scared to go home" and "scared that Mr. Patel was going to know where she was." Nadia would ask Jahved if Nadia could park her car in Jahved's garage so Patel would not know where Nadia was. Nadia was afraid that someone would be looking for her car. Nadia would even ask Jahved to store Nadia's phone number on Jahved's cell phone under a fictitious name "because she is so scared that someone might see it and give it to him or he might hack into it and see her name."

---

**22.** Patel adduced evidence that Nadia successfully changed jobs after the videos were uploaded to the Internet.

Jahved also testified about the "big difference" in Nadia's involvement in the community after the situation with Patel. Nadia "used to come out a lot" with their group of friends, but now she pretty much only hangs out with Jahved and Chowdhry. She does not hang out with the people they used to mutually hang out with because Nadia "feels uncomfortable and embarrassed because everyone knows about it or has questions about it." Nadia has become a very private person since 2012 and has become very protective of her privacy. According to Jahved, Nadia tells people, "[D]on't tell anyone I am here. Don't post a picture of me. [Patel] will know I am here or don't tag me don't do this." Jahved testified that the situation with the video has "just been hell for [Nadia]."

Nadia's former coworker and college classmate, Chris Charles, testified about Nadia's condition: "I know that this conflict has caused mental anguish with Nadia." He explained, "I've seen Nadia in pain and frightened states of being." He elaborated on one occasion that Patel came to visit Nadia when she was in college: she was scared and upset, lost her focus, and worried about what Patel was capable of doing. Charles testified about another time that Nadia thought she saw Patel at their work when Charles and Nadia had gone out to lunch: Nadia suddenly stopped talking, she was very stiff, she was frightened, and she did not want to get out of the car.

Another of Nadia's former coworkers, Rachel Rothberg, testified about when Patel came to their place of employment: Nadia "seemed very flustered and panicked" and she "couldn't really focus on whatever she was working on." When Patel would call Nadia at work, she became distressed. Rothberg testified, "Nadia would express to me fear that he was around," and Rothberg had seen Nadia cry over this issue. Rothberg referred to this as a "horrible situation" for Nadia.

Patel also adduced evidence that Nadia continued to engage in some of the activities that she enjoyed, such as going on trips, attending concerts, and hanging out with friends. The trial court admitted hundreds of pictures and posts from social media that were made after Patel uploaded Nadia's video to the Internet, which showed Nadia with friends and attending events. Nadia's counsel stipulated in front of the jury that the pictures showed Nadia "outside of her house engaged in normal day-to-day activities."[23]

### E. The Verdict and Judgment

The jury found in Nadia's favor on her claims for IIED, intrusion on seclusion, public disclosure of private facts, and defamation.[24] Following each liability question, the jury was presented with separate damages questions. The jury awarded damages as follows for each claim:

IIED (Question 2)

> Mental anguish sustained in the past: $15,000.
>
> Mental anguish that, in reasonable probability, Nadia Hussain will sustain in the future: $15,000.

**23.** When it appeared that defense counsel intended to cross-examine Nadia about each of the pictures and posts, the trial court asked the attorneys to approach the bench. The court asked Nadia's counsel if he would stipulate that all the pictures were taken "between a certain time period that showed the plaintiff out of the house," so that "we don't have to go through picture by picture." Nadia's counsel agreed, and the stipulation was made for the jury.

**24.** As explained below, however, the jury also found that the defamatory publication was substantially true.

Intrusion on Seclusion (Question 4)

Mental anguish sustained in the past: $32,500.

Mental anguish that, in reasonable probability, Nadia Hussain will sustain in the future: $32,500.

Public Disclosure of Private Facts (Question 6)

Mental anguish sustained in the past: $75,000.

Mental anguish that, in reasonable probability, Nadia Hussain will sustain in the future: $75,000.

Defamation (Question 10)

Injury to reputation sustained in the past: $5,000

Injury to reputation that, in reasonable probability, Nadia Hussain will sustain in the future: $5,000

Mental anguish sustained in the past: $10,000.

Mental anguish that, in reasonable probability, Nadia Hussain will sustain in the future: $10,000.

For each claim, the jury also found that Patel acted with malice. The jury awarded exemplary damages as follows: $75,000 for IIED (Question 12); $80,000 for intrusion on seclusion (Question 14); $50,000 for public disclosure of private facts (Question 16); and $20,000 for defamation (Question 18).

The trial court signed a final judgment for $500,000. After the trial court denied Patel's motions for new trial and JNOV, Patel appealed.

## II. Defamation and Substantial Truth

In his first issue, Patel contends the trial court erred by awarding damages to Nadia on her defamation claim because the jury found that the published material was substantially true. Nadia contends Patel waived error because Patel failed (1) to request that the damages question for the defamation claim include a proper conditioning instruction; and (2) to ask the trial court to correct an irreconcilable conflict in the jury's answers. Nadia also contends that we should "reconcile the conflict" in the jury's answers to uphold the damages awarded because the jury erroneously found the published material to be substantially true.

First, we review the jury charge in detail. Then, we hold that Patel did not waive this issue, and there is no conflict in the jury's answers. Accordingly, the trial court erred by denying Patel's motion for JNOV on this ground.

### A. Jury Charge

The jury answered "yes" to Question No. 7: "Did Akhil Patel publish the following: Personal and/or private video(s) of Nadia Hussain." The jury answered "yes" to Question No. 8: "Was the statement in Question 7 defamatory concerning Nadia Hussain?" Question No. 8 defined "defamatory" as:

an ordinary person would interpret the statement in a way that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury, or to impeach the person's honesty, integrity, virtue, or reputation.

The jury answered "yes" to Question No. 9: "Was the matter in Question 7 substantially true at the time it was made/posted as it related to Nadia Hussain?"

The damages question, Question No. 10, contained a conditioning instruction: "If you answered 'Yes' to Question 8, then answer the following question. Otherwise do not answer the following question." The jury answered the question and found damages totaling $30,000 for past and future mental anguish and injury to reputation. In Question No. 17, the jury found

that the harm to Nadia resulted from malice, and the jury awarded $20,000 in exemplary damages in Question No. 18 based on "the conduct found in response to Question 7 and 8."

## B. No Waiver Due to Conditioning Language

Citing this court's opinion in *Environmental Procedures, Inc. v. Guidry*, 282 S.W.3d 602 (Tex.App.—Houston [14th Dist.] 2009, pet. denied), and the cases cited therein, Nadia contends "it is well established in Texas law that an appellant waives any objection to the trial court's failure to include a proper conditioning instruction by failing to either object or to tender a proper instruction during the charge conference." We disagree with Nadia's interpretation of *Guidry* and the related authorities.

*Guidry* recites the familiar principle that a party waives any error arising from the jury's *failure* to answer a question when the question contains an unobjected-to conditioning statement. *See id.* at 632 & n. 48. Patel, however, is not complaining about the jury's failure to answer a question. *Guidry* does not hold, as Nadia argues, that a party asserting an affirmative defense waives error in the judgment when: (1) the jury answered "yes" for an affirmative defense; (2) the damages question did not condition an answer on a "no" finding of the affirmative defense; and (3) the jury answered the damages question.

Patel has not waived error on this basis.

## C. No Waiver for Conflicting Findings

■ Nadia suggests that Patel is complaining about a conflict in the jury's answers and contends that the jury's "yes"

answer to the affirmative defense of substantial truth and the jury's award of damages for defamation are in "irreconcilable conflict." Nadia cites the familiar rule that a party waives any complaint regarding an alleged conflict in the jury's answers by failing to voice the complaint before the jury is discharged. *See Meek v. Onstad*, 430 S.W.3d 601, 605–06 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

■ "The threshold question in reviewing jury findings for fatal conflict is 'whether the findings are about the same material fact.'" *Arvizu v. Estate of Puckett*, 364 S.W.3d 273, 275 (Tex.2012) (quoting *Bender v. S. Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex.1980)). We must harmonize jury findings when possible. *Id.* at 276. The question is not whether the findings may be viewed reasonably as conflicting. *Bender*, 600 S.W.2d at 260. Rather, we must "uphold jury findings if there is 'any reasonably possible basis upon which they may be reconciled.'" *Arvizu*, 364 S.W.3d at 276 (quoting *Bender*, 600 S.W.2d at 260).

The jury's findings regarding Patel's affirmative defense of substantial truth and Nadia's damages are not about the same material fact. It is entirely possible that a party suffers reputation and mental anguish damages from a substantially true statement.[25] Thus, there is no conflict in the jury's answers, and Patel was not required to object before the jury was discharged to preserve error.

## D. Defamation Claim Fails

■ The affirmative defense of substantial truth is a complete defense to defamation. *Knox v. Taylor*, 992 S.W.2d

---

**25.** For example, if a restaurant critic writes that she found a cockroach in her soup, the statement could damage the restaurant's reputation even though the statement is true. If a doctor tells a patient that she has a fatal and incurable disease, the patient may suffer mental anguish even though the statement is true.

40, 54 (Tex.App.—Houston [14th Dist.] 1999, no pet.); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 73.005. A jury's finding of substantial truth precludes liability for a defamation claim. *See Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 115 (Tex. 2000). And, in the absence of liability, the question of damages becomes immaterial. *See Hancock v. City of San Antonio,* 800 S.W.2d 881, 885 (Tex.App.—San Antonio 1990, writ denied). The same rationale applies to a finding of actual malice and exemplary damages. *See Tex. Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211–12 (Tex. 1996) (actual malice finding and exemplary damages rendered immaterial by jury's answers establishing an affirmative defense; "the trial court should have disregarded the actual malice finding as immaterial"). Thus, the trial court erred by denying Patel's motion for JNOV on this basis. The trial court should have disregarded the jury's award of $50,000 in damages for the defamation claim.

Patel's first issue is sustained.

### III. ONE SATISFACTION RULE

■ In his second issue, Patel contends that the "jury's finding or quadruple recovery for all four theories of liability is erroneous and against the 'one-satisfaction' rule." Patel asks this court to "limit Appellee's recovery, if any, to the cause of action where she has the greatest award." Patel contends that his second issue "was presented to the trial court in Appellant's Motion for Judgment Notwithstanding the Verdict and Motion for New Trial." We disagree. Patel has not preserved error.

■ We may not consider unpreserved issues. *Fed. Deposit Ins. Corp. v. Lenk,* 361 S.W.3d 602, 604 (Tex.2012); *see also Allright, Inc. v. Pearson,* 735 S.W.2d 240, 240 (Tex.1987) ("A point of error not preserved, is not before the appellate court for review."). To preserve error regarding a plaintiff's failure to elect her remedy, or to complain that the trial court's judgment violates the one-satisfaction rule, a defendant must inform the trial court of the complaint. *See Solomon v. Steitler,* 312 S.W.3d 46, 61 (Tex.App.—Texarkana 2010, no pet.) (citing *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184 (Tex.1998) (noting that the defendant properly raised the issue by requesting, before judgment, that the trial court require the plaintiff to elect its remedy)). To preserve error, a party's argument on appeal must comport with the complaint in the trial court. *Garcia v. Alvarez,* 367 S.W.3d 784, 788 (Tex.App.—Houston [14th Dist.] 2012, no pet.). A party's complaint in the trial court must state the grounds for the ruling sought "with sufficient specificity to make the trial court aware of the complaint." Tex. R.App. P. 33.1(a)(1)(A).

Patel did not mention the one-satisfaction rule or the election of remedies in his motion for new trial or motion for JNOV. Nor did Patel cite any case law that mentioned the one-satisfaction rule or the election of remedies. Although he complained about Nadia's "quadruple recovery" and "double recovery," the argument was made only in the context of (1) the trial court's failure to include a particular instruction in Question No. 6, i.e., jury charge error;[26]

---

**26.** Patel's argument in his motion for new trial, under the heading "Erroneous Charge," appears as follows:

The Court erred by submitting Question 6 to the Jury without providing the instructions and limiting language of "do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not add any amount of interest on damages, if any. You must award at least nominal damages if you find any injury to have occurred."

(2) the trial court's failure to include a similar instruction regarding the recovery of exemplary damages, i.e., jury charge error;[27] and (3) the jury's failure to "follow the charge of the court" for Question No. 4, i.e., a challenge to the sufficiency of the evidence.[28]

The jury instructions that Patel complained about in his motions were not one-satisfaction or election-of-remedies instructions. Rather, such an instruction informs a jury to not award double recovery based on *elements* of damages for a particular claim. The instruction prevents duplicative recovery when a jury is asked to award different elements of damages separately under one claim—for example, "physical impairment," "diminished capacity to work and earn money," "loss of earning capacity," and "physical pain and mental anguish." *See Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 825 (Tex.App.—Houston [1st Dist.] 1999, pet. denied); *French v. Grigsby*, 567 S.W.2d

604, 608 (Tex.Civ.App.—Beaumont), *writ ref'd n.r.e.*, 571 S.W.2d 867 (Tex.1978); *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 770 (Tex.2003) (approving of the instruction in *French*, noting that "[t]his type of instruction informs the jury that it is not to make a duplicative award of damages").

The one-satisfaction rule serves a distinct function. It "limits a plaintiffs recovery to one of several overlapping theories." *Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72, 80 (Tex.App.—El Paso 1998, pet. denied). While the jury instructions referenced in Patel's motions would have prevented the jury from awarding duplicative amounts for different *elements* of damages on one claim—such as past mental anguish, future mental anguish, past injury to reputation, and future injury to reputation—the instructions had nothing to do with requiring the plaintiff to elect one of several theories of recovery under the one-satisfaction rule.

Patel's argument in his JNOV motion appears as follows:

Additionally, the jury's answer to Question 6, regarding mental anguish damages, should be disregarded based on legal principle. The charge should have specifically stated, as it did prior, "do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any." The jurors provided for quadruple recovery because they already provided for mental anguish recovery under intentional infliction of emotional distress, intrusion on seclusion, and defamation.

(emphasis omitted).

27. Patel's argument in his motion for new trial, under the heading "Erroneous Charge," appears as follows:

The Court erred by submitting Questions 13-18 to the Jury that did not provide limiting instructions regarding double recovery. If any mental anguish damages were provided for in one cause of action, then exem-

plary damages should be limited, if found, to that one cause of action, voiding the necessity of any other finding of exemplary damages.

28. Patel's argument in his JNOV motion, contained in the section addressing the sufficiency of the evidence of the jury's answers to the intrusion upon seclusion claim, appears as follows:

Additionally, the jury's answer to Question 4, regarding mental anguish damages, should be disregarded based on legal principle. The charge specifically states "do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any." The jurors did not follow the charge of the court and they provided for quadruple recovery because they already provided mental anguish recovery under intentional infliction of emotional distress, public disclosure of private facts, and defamation.

(emphasis omitted).

In sum, Patel's complaints about the omission of jury instructions and the jury's failure to follow jury instructions were not sufficiently specific to make the trial court aware of the complaint now urged on appeal regarding the one-satisfaction rule. *See* Tex.R.App. 33.1(a)(1)(A). Thus, Patel failed to preserve error.

Patel's third issue is overruled.

### IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In his third issue, Patel contends the trial court erred by not granting his motion for JNOV on the IIED claim because this "gap-filler" tort is unavailable under the facts of this case. In particular, Patel claims that his conduct invaded Nadia's legally protected privacy interest under her claims for intrusion on seclusion and public disclosure of private facts. We agree.

IIED is a "gap-filler tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann–La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex.2004). IIED "simply has no application when the actor intends to invade some other legally protected interest, even if emotional distress results." *Id.* (quotations omitted). "Where the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available." *Id.*

Nadia contends that IIED applied here because Patel intended to invade a right that was not legally protected. She argues, "Patel engaged in numerous extreme and outrageous acts that are not actionable under any other theory of recovery." Nadia cites a single example: when Patel sent Nadia a text message threatening to play Nadia's video during a mutual friend's wedding. Specifically, Nadia contends the "wedding threat" did not lie within the umbra of Nadia's claim for intrusion on seclusion.[29]

Nadia contends that Patel's threat involved a "public place," and she cites *Floyd v. Park Cities People, Inc.*, for the proposition that "it is well-established in Texas law that if an intrusion involves a public place or public matters, the defendant is not liable." *See* 685 S.W.2d 96, 97–98 (Tex.App.—Dallas 1985, no writ). We disagree with Nadia's broad interpretation of *Floyd*. *Floyd* concerned more than mere "involvement" with a public place or concern. In *Floyd*, a newspaper published a picture of the plaintiff's front yard, which included the plaintiff standing on his front porch. *Id.* at 97. The yard and plaintiff had been in full view of the public at the time, and the topic of the plaintiff's front yard "had become the subject of a controversy which was publicly debated before the Highland Park Town Council." *Id.* The Dallas Court of Appeals affirmed summary judgment on the invasion of privacy claim because there was no intrusion on the plaintiff's solitude, seclusion, or private affairs as a matter of law. *See id.* at 97–98.

Here, according to the charge, the jury found that Patel "intentionally intrude[d] into Nadia Hussain's solitude, seclusion, or private affairs or concerns in a manner that would be highly offensive to a reasonable person." At trial, Nadia presented

---

29. Without citing to the record or authority, Nadia also contends that Patel's "threats to embarrass Nadia in front of her friends and family are otherwise non-actionable" under her invasion of privacy theories. We overrule this contention for the same reasons discussed below concerning the "wedding threat."

the "wedding threat" as one of hundreds of offensive and threatening text messages Patel sent to her, along with the phone calls and hacking attempts, to establish an intentional intrusion on Nadia's solitude, seclusion, or private affairs. *See Driscol,* 989 S.W.2d at 84–85 (sufficient evidence for invasion of privacy when the defendant made frequent offensive telephone calls to the plaintiff). The wedding threat involved a "public place or public matter" only in the tangential sense that Patel was threatening another theory of invasion of privacy upon which Nadia successfully recovered at trial—public disclosure of private facts. Unlike the picture in *Floyd,* the secretly recorded video depicted Nadia in a private place engaged in private conduct that was not publicly debated or a matter of public concern. A privately communicated threat to reveal such private content at a wedding does not involve a public place or public matter as in *Floyd.*

Nadia also relies on *Durban v. Guajardo,* wherein the Dallas Court of Appeals held that a plaintiff could recover under a theory of IIED and assault even though the two claims "involve[d] the same acts by" the defendant—the defendant physically attacked the plaintiff. 79 S.W.3d 198, 203–04, 206 (Tex.App.—Dallas 2002, no pet.). The court of appeals reasoned that the plaintiff could maintain an action for IIED even though emotional distress was "the essence" of an assault and battery claim. *Id.* at 206. We decline to follow *Durban*; its reasoning is inconsistent with Texas Supreme Court's pronouncements in *Zeltwanger. See* 144 S.W.3d at 447–448 (citing *Rice v. Janovich,* 109 Wash.2d 48, 742 P.2d 1230, 1238 (Wash.1987) (holding that the trial court erred to instruct the

jury on IIED in addition to assault because a plaintiff can recover emotional distress damages for an assault claim)).

From reviewing the entire record, we conclude that the gravamen of Nadia's complaint was fully encompassed by her invasion of privacy claims for intrusion on seclusion and public disclosure of private facts. Nadia complained globally about Patel's frequent threatening and offensive communications, hacking into her accounts, and uploading the secretly recorded videos to the Internet. Neither on appeal nor at trial has Nadia identified evidence that would enable recovery under a theory of IIED independent of her other claims. *Cf. Oliphint v. Richards,* 167 S.W.3d 513, 517 (Tex.App.—Houston [14th Dist.] 2005, pet. denied) (affirming summary judgment on IIED because the IIED claim was not based on facts independent of a defamation claim).

Accordingly, IIED was unavailable as a matter of law. The trial court erred by not granting Patel's motion for JNOV on this ground and thereby incorporating the jury's award of damages for IIED in the final judgment. *See Zeltwanger,* 144 S.W.3d at 450 (court of appeals should render judgment for the appropriate amount of damages when the judgment awards relief on an unavailable claim such as IIED).

Patel's third issue is sustained.

## V. SUFFICIENCY OF THE EVIDENCE: MENTAL ANGUISH DAMAGES

In his fourth and fifth issues, Patel challenges the legal and factual sufficiency of the evidence to support the jury's finding of mental anguish damages.[30] We hold

---

30. Respectively, Patel's fourth and fifth issues are: (1) "Appellee's stipulation that she was able to participate in day-to-day activities establishes that Appellee did not have a substantial disruption to her daily routine, and thus

any jury finding of mental anguish damages is erroneous;" and (2) "The evidence of the case does not establish a high degree of mental pain, and in fact establishes the opposite. The finding of mental anguish damages is legally

that the evidence is legally and factually sufficient to support the jury's award of $107,500 for past mental anguish and $107,500 for future mental anguish on the invasion of privacy claims.

## A. Legal Sufficiency

To uphold a jury's award of mental anguish damages under a legal sufficiency review, there must be evidence of the existence of compensable mental anguish and evidence to justify the amount awarded. *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex.2013). "Mental anguish is only compensable if it causes a 'substantial disruption in . . . daily routine' or 'a high degree of mental pain and distress.'" *Id.* (alteration in original) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995)). Thus, mental anguish damages cannot be awarded without either (1) direct evidence of the nature, duration, or severity of the plaintiff's anguish, thus establishing a substantial disruption in the plaintiff's daily routine; or (2) other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996).

Evidence of mere disappointment, anger, resentment, or embarrassment is insufficient by itself, although mental anguish may include all of these emotions. *Plasencia v. Burton*, 440 S.W.3d 139, 148 (Tex.App.—Houston [14th Dist.] 2013, no pet.); *see also Parkway*, 901 S.W.2d at 444. Proof of mental anguish may include "painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all

of those feelings." *Plasencia*, 440 S.W.3d at 148. Mental anguish also may include the loss of enjoyment of life. *Brookshire Bros., Inc. v. Wagnon*, 979 S.W.2d 343, 354 (Tex.App.—Tyler 1998).

Accordingly, in a sufficiency review, we "must distinguish between shades and degrees of emotions," such as "between disappointment and severe disappointment, between embarrassment and wounded pride, [and] between anger and indignation." *Parkway*, 901 S.W.2d at 444. "We apply a traditional no-evidence standard to a mental anguish finding to determine whether the record reveals any evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 916–17 (Tex.2008) (quotation omitted).

Although juries have discretion in finding mental anguish damages, juries cannot simply pick a number and put it in the blank. *Saenz*, 925 S.W.2d at 614. Juries must find an amount that fairly and reasonably compensates for the loss. *Id.* To support an award of future mental anguish damages, the plaintiff must demonstrate a reasonable probability that the plaintiff will suffer compensable mental anguish in the future. *Adams*, 265 S.W.3d at 917. And, some types of "disturbing or shocking injuries"—such as a "threat to one's physical safety or reputation"—"have been found sufficient to support an inference that the injury was accompanied by mental anguish." *Parkway*, 901 S.W.2d at 445.

Here, there is some evidence that Nadia's daily routine was substantially dis-

and factually insufficient." The legal basis for Patel's fourth issue is not entirely clear, but we construe the brief liberally and understand

his argument (that the jury's finding is "erroneous") as a challenge to the legal sufficiency of the evidence. *See* Tex. R. App. P. 38.9,

rupted. Because of Patel's invasions of her privacy, she felt like a liability living at home with her family, and she wanted to remove herself from the situation. So she moved out of the house, and she chose an apartment with upgraded security features. Nadia's friend testified that Nadia was scared to go home and afraid that Patel was looking for her. Accordingly, Nadia would alter where she parked her car and asked friends to not share her whereabouts on social media or store her contact information in a phone. While she was living with her family, they had to take the phone off the hook to avoid Patel's calls. Nadia had to set up extra security with her cellular service provider to prevent Patel from hacking her accounts, and she changed her phone number several times in an attempt to avoid his calls and messages.

Nadia testified that she missed about five days of work because of Patel's conduct, and her friends corroborated this testimony. Her family and friends similarly testified about how Nadia "changed a lot," looked like she was "nervous all the time," and suffered from a loss of confidence. Nadia had been active in the Muslim community, but she became less involved as a result of Patel uploading the secretly recorded video to the Internet. There was a "big difference" between Nadia's involvement in the community. She used to go out a lot with friends but now mostly only spends time with two friends. Nadia would avoid other friends because everyone knew about the video, they were talking about the video, and they had questions about it.

Patel contends there is no evidence of a substantial disruption to Nadia's daily routine because Nadia testified that she still saw friends, attended events, and traveled occasionally. Patel also emphasizes counsel's stipulation that there were hundreds of pictures and social media posts depicting Nadia engaged in day-to-day activities. Patel's evidence, however, does not negate Nadia's. It merely raises a fact issue that the jury resolved in Nadia's favor.

■ Even assuming, however, that all this evidence is actually no evidence of a substantial disruption of her routine, "that lack of evidence did not negate the evidence that she *did* suffer compensable mental anguish." *See Service Corp. Int'l v. Guerra,* 348 S.W.3d 221, 233 (Tex.2011) (widow of decedent, whose body had been moved after burial, suffered $2 million in compensable mental anguish "even assuming there was no evidence her routine was disrupted"). There is also evidence that Nadia suffered a high degree of mental pain and distress—more than mere worry, anxiety, vexation, embarrassment, or anger.

Of course, there is ample testimony that Nadia was embarrassed and worried. But Nadia was also frightened and scared all the time, and she suffered humiliation. Nadia's mother and close friends described the "horrible situation" Nadia had been living and how it had "just been hell" for her. Sakina testified how Nadia had been crying, screaming, shaking, and could only talk in between crying when discussing the issue about Patel. Nadia's friend had seen Nadia cry because of Patel's conduct, and Nadia was afraid that Patel was around. Another friend described how he had seen Nadia frightened and in pain. When Patel attempted to visit Nadia, she became distressed, flustered, panicked, scared, upset, and suffered a loss of focus. Nadia also testified that she did not know if she could trust anyone again and would not know if other people she met in the future had seen her video, or what they would think if they eventually knew about it. She feels like she "can't face anyone." The situation was so bad that she felt like she "just

wanted to give up." She is nervous all the time now, and she had seen a licensed professional a few times before trial. Nadia was humiliated because all her friends were talking about the video.

Further, we note that the nature of the invasions of privacy here are particularly disturbing and shocking and should give rise to an inference of mental anguish resulting from the threats to Nadia's reputation. *See Parkway*, 901 S.W.2d at 445; *see also Capps v. Nexion Health at Southwood, Inc.*, 349 S.W.3d 849, 871–72 (Tex. App.—Tyler 2011, no pet.) (affirming mental anguish damages for wrongful termination in part because "wrongdoing that threatens a person's reputation is sufficient to support an inference that the resulting injury was accompanied by mental anguish"); *Rogers v. City of Fort Worth*, 89 S.W.3d 265, 284 (Tex.App.—Fort Worth 2002, no pet.) (same); *cf. Boyles v. Kerr*, 855 S.W.2d 593, 603 (Tex.1993) (Gonzalez, J., concurring on reh'g) (describing the defendant's conduct of secretly recording his sexual encounter with the plaintiff and then sharing it with friends as "grossly offensive conduct which no one should tolerate"). There is evidence that Patel secretly recorded Nadia masturbating. He then badgered Nadia and her mother for years by threatening to disclose the video to Nadia's friends, family members, and coworkers. On top of the other invasions of privacy,[31] Patel ultimately uploaded the video to the Internet and then boasted about the 5,000 people who had viewed the video and 300 who had downloaded it. As shown by the text messages, Patel did this with the specific intent to ruin Nadia's reputation, ruin her life, and hurt her.

Patel's authorities do not command a different result. In *Parkway Co. v. Woodruff*, a jury awarded the plaintiff-homeowners mental anguish damages against a developer for negligence after their home flooded. *See* 901 S.W.2d at 436. One of the plaintiffs testified merely that he was "hot" and "very disturbed" about the situation. *Id.* at 445. The other plaintiff testified that the situation was "not pleasant," it was "upsetting," they were "very quiet," and it caused "friction" between the plaintiffs. *Id.* at 445. The Texas Supreme Court affirmed the court of appeals' reversal of the mental anguish damages because, although the plaintiffs felt anger, frustration, or vexation, these were "mere emotions" and not compensable mental anguish. *Id.*

In *Gunn Infiniti, Inc. v. O'Byrne*, a jury awarded the plaintiff mental anguish damages for fraud and a DTPA violation after a used car salesman misrepresented the condition of an Infiniti. 996 S.W.2d 854, 855–56 (Tex.1999). The car had not been equipped with an airbag as the plaintiff had been told, and the front of the car had been repainted after the car had been damaged. *Id.* at 856. Although the plaintiff testified that he was embarrassed and "publicly humiliated" and that he received "a lot of grief" and "ridicule" from his friends, the Texas Supreme Court clarified that this mental anguish was caused by the fact that he bought an Infiniti, generally, and not by the car dealership's specific misrepresentations about the Infiniti. *Id.* at 860–61. The only remaining testimony that the plaintiff offered was "conclusory" and lacked sufficient details to affirm the judgment. *See id.* (testimony such as "I have a constant, a constant mental sensa-

---

31. As noted above, Patel would prank call Nadia's house multiple times per day in the middle of the night when she lived with her mother and grandparents. He visited and called her at work. He obtained Nadia's and her mother's social security numbers. And he hacked or attempted to hack into her accounts with Apple, Verizon, and her email service provider.

tion of pain or a rude awakening"). The mental anguish damages could not be sustained under these circumstances. *See id.* at 861.

In *Service Corp. International v. Guerra*, a jury awarded the plaintiffs (a widow and daughters of the decedent) mental anguish damages after the defendants had buried the decedent's body in an incorrect plot and then moved it to a new plot eighteen inches laterally despite the plaintiffs' objections. 348 S.W.3d at 227. The Texas Supreme Court reversed the $100,000 award of mental anguish damages for each of the three daughters. *Id.* at 232. One of the daughters had lost some sleep "just thinking" because the situation was "very difficult," and she testified that the family was frustrated and in agony. *Id.* Another daughter testified that the situation was "hard," and they were "not at peace" and "were always wondering" where their father was buried. *Id.* The third daughter provided no testimony about mental anguish, although some other witnesses testified that the family was "bothered" and suffered "a level of devastation." *Id.* The supreme court held that although this evidence showed "very strong emotional reactions," none of the witnesses identified a specific high degree of mental pain and distress or a substantial disruption to any one of the daughters' daily routine. *Id.*

Finally, in *Hancock v. Variyam*, a jury awarded mental anguish damages to a plaintiff-doctor for defamation after the defendant-doctor circulated a letter to colleagues that stated the plaintiff lacked veracity and spoke in half-truths. 400 S.W.3d at 62. The plaintiff testified that the situation had been disruptive, embarrassing, distracting, stressful, and humili-

ating; and he lost some sleep and considered moving out of the city. *Id.* at 69. However, the Texas Supreme Court reversed the mental anguish damages, noting that (1) the plaintiff did not require medical attention; (2) the plaintiff did not elaborate on the impact of his anxiety or depression on his life; (3) no other witnesses corroborated an outward manifestation of the mental anguish; (4) the plaintiff did not move or suffer a substantial disruption of his daily routine; and (5) the plaintiff continued interacting with the recipients of the letter, and the letter did not affect his care of patients. *See id.* at 69–70.

Here, as discussed above, Nadia testified about more than "mere emotions" such as being upset or enduring an unpleasant situation. Unlike in *Gunn Infiniti*, Nadia's feelings of humiliation and her conduct of extricating herself from friendships was directly related to Patel's conduct of uploading the surreptitiously recorded video to the Internet. Although some testimony was conclusory in isolation, we do not rely on that testimony while upholding the jury's verdict for mental anguish damages.[32] Nadia offered, through her own testimony and that of family and friends, sufficient non-conclusory evidence demonstrating a substantial disruption of her daily routine and a high degree of mental pain and distress.

Unlike in *Hancock*, Nadia offered evidence that showed more than a strong emotional reaction—she changed where she lived and how she lived; she stopped interacting with some friends and altered how she interacted with others; she changed in her demeanor, such as with her loss of confidence and constant nervous-

---

**32.** For example, Charles testified that "this conflict has caused mental anguish with Na- dia."

ness; and she expressed and manifested (corroborated by other witnesses) a high degree of mental pain and distress including but not limited to embarrassment, fright, devastation, nervousness, and humiliation.

■ On appeal, Patel globally challenges mental anguish damages and does not separately challenge the jury's award of future mental anguish damages or cite to authority relevant to future mental anguish damages. Any such challenge is, therefore, waived. *See* Tex.R.App. P. 38.1(i) (brief must contain clear and concise argument with citations to authorities); *Canton–Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931 (Tex.App.—Houston [14th Dist.] 2008, no pet.) (failure to cite legal authority results in waiver); *cf. Price v. Short*, 931 S.W.2d 677, 688 (Tex.App.—Dallas 1996, no writ) (concerning multi-element damages award, "[t]he failure to address an element of damages results in waiver of the sufficiency challenge").

■ But out of an abundance of caution, we now review the evidence for those damages. We hold that there is some evidence demonstrating a reasonable probability that Nadia will suffer compensable mental anguish in the future. Nadia testified about how her humiliation and fright were ongoing at the time of trial. Other witnesses testified about how Nadia had changed emotionally and altered her behavior by the time of trial. The jury could infer from the evidence of Nadia's mental anguish at the time of trial that Nadia would continue to suffer mental anguish in the future. *See Wichita Cnty. v. Hart*, 892 S.W.2d 912, 927 (Tex.App.—Austin 1994) (jury reasonably could infer future mental anguish damages from past and present mental anguish), *rev'd on other grounds*, 917 S.W.2d 779 (Tex.1996); *cf. Hicks v. Ricardo*, 834 S.W.2d 587, 591–92 (Tex.

App.—Houston [1st Dist.] 1992, no pet.) (holding that a jury's finding of zero damages for future mental anguish was factually insufficient because "the same circumstances that produced at least some of the previous mental anguish are likely to recur"). And, Nadia expressed specific concerns about her future relationships and employment due to the distribution of the videos on the Internet.

Patel acknowledged in the text messages to Nadia, "The Internet is huge you will never find out where it's posted," and, "Can't stop SOCIAL MEDIA!!" Patel told Nadia to "accept that this is never going to go away" and that she would "never live this down." These messages conveyed the notion, which would be commonly understood by the jurors who awarded Nadia future mental anguish damages, that pornography shared on the Internet can exist forever and circulate indefinitely. *See* Salina Tariq, *Revenge: Free of "Charge?"*, 17 SMU Sci. & Tech. L.Rev. 227, 239 (2014) ("Once the image is made available on the Internet, it is forever accessible across the globe."); *cf. United States v. Flanders*, 752 F.3d 1317, 1341 (11th Cir.2014) (approving of an upward departure from the sentencing guidelines for "prolonging the victims' pain or humiliation" because the defendant videotaped another man having sex with women who were under the influence of drugs and then "distributed those videos over the Internet, where the videos will be available indefinitely" (alteration and quotation omitted)). As courts have observed for years in another context involving sexual performances that are recorded without consent and shared on the Internet—child pornography—the recording and sharing of pornography perpetuates the harm to the complainant. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (analo-

gizing child pornography to a "defamatory statement," where "each new publication of the speech would cause new injury to the child's reputation and emotional well-being"; reasoning that because there is a "permanent record" in the form of pornography, "the continued circulation itself would harm the child who had participated").[33]

In sum, the evidence is legally sufficient to support the jury's award of past and future mental anguish damages.

## B. Factual Sufficiency

 Patel also challenges the factual sufficiency of the evidence and requests a remand to the trial court for consideration of a remittitur. In this context, we must examine all of the evidence in the record to determine whether sufficient evidence supports the damages awarded, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Wagnon*, 979 S.W.2d at 354. "The process of awarding damages for amorphous, discretionary damages, such as mental anguish and pain and suffering, is inherently difficult because the injury constitutes a subjective, unliquidated, non-pecuniary loss." *Id.* "It is necessarily an arbitrary process, not subject to objective analysis." *Id.* (quotation omitted). "Because there are no objective guidelines to assess the money equivalent to such injuries, the jury is given a great deal of discretion in awarding an amount of damages it determines appropriate." *Id.*

 Patel cites no factually analogous cases, and he argues only that the social media posts and pictures depicted Nadia's "progressing life, participation in fun daily activities, upward progression in her career, and continued involvement with her friends, community, and family." This evidence, as explained above, did not negate Nadia's evidence of mental anguish in the form of a high degree of mental pain and distress. *See Guerra*, 348 S.W.3d at 233 (affirming $2 million award in past mental anguish damages even though there was no evidence of a substantial disruption of daily routine, and there was evidence that the plaintiff volunteered at a nursing home, participated in visitation with her church, worked in the church kitchen, and traveled occasionally). Additionally, mental anguish may be shown by a "substantial" disruption of a daily routine—"total" disruption is not required. *See id.* at 231. We reach the same conclusion regarding future mental anguish damages as "the circumstances that produced at least some of the previous mental anguish are likely to recur." *See Hicks*, 834 S.W.2d at 591–92.

Our review of the entire record confirms that the jury's award of $107,500 for past mental anguish and $107,500 for future mental anguish on the invasion of privacy claims is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

Patel's fourth and fifth issues are overruled.

## VI. EXEMPLARY DAMAGES

In his sixth and final issue, Patel contends that the award of exemplary dam-

---

**33.** *See also Osborne v. Ohio*, 495 U.S. 103, 111, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children in years to come."); *United States v. Cunningham*, 680 F.Supp.2d 844, 864 (N.D.Ohio 2010) ("The mere knowl- edge that images exist and are being circulated causes shame, humiliation, and powerlessness. This victimization lasts forever since the pictures can resurface at any time, and this circulation has grown exponentially because of the Internet." (quotation omitted)), *aff'd*, 669 F.3d 723 (6th Cir.2012).

ages must be reversed because there is no evidence of mental anguish damages. *See Saenz*, 925 S.W.2d at 614 ("Without evidence of actual damages, punitive damages cannot be recovered."). Because we have overruled Patel's fourth and fifth issues concerning the sufficiency of the evidence to support the award of mental anguish damages on Nadia's invasion of privacy claims, Patel's sixth issue lacks merit.

Patel's sixth issue is overruled.

## VII. CONCLUSION

We have sustained Patel's first and third issues and concluded that the trial court erred by including in the judgment damages associated with the defamation and IIED claims.[34] Having overruled the remainder of Patel's issues, we modify the trial court's judgment to reduce the amount of damages from $500,000 to $345,000. *See Zeltwanger*, 144 S.W.3d at 450 (remanding to court of appeal for rendition of the appropriate amount of damages).

The judgment is affirmed as modified.

---

34. The trial court erroneously included $155,000 in damages as follows: (1) damages associated with the IIED claim, including $15,000 for past mental anguish, $15,000 for future mental anguish, and $75,000 for exemplary damages; and (2) damages associated with the defamation claim, including $5,000 for past injury to reputation, $5,000 for future injury to reputation, $10,000 for past mental anguish, $10,000 for future mental anguish, and $20,000 for exemplary damages.