**Opinion issued March 31, 2020**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

## NO. 01-18-00231-CV

———————————

### AMERJIN CO., LLC, AMERJIN ENERGY, LLC, AND XI "PETER" ZHU, Appellants

### V.

### ASHBY LLP, Appellee

---

### On Appeal from the 334th District Court
### Harris County, Texas
### Trial Court Case No. 2015-41401

---

### MEMORANDUM OPINION

Appellants, Amerjin Co., LLC ("Amerjin"), Amerjin Energy, LLC ("Amerjin Energy"), and Xi "Peter" Zhu (collectively, "appellants"), challenge the trial court's judgment, entered after a jury trial, in favor of appellee, Ashby LLP, on its claim against appellants for breach of contract and appellants' counterclaim for breach of

fiduciary duty. In three issues, appellants contend that the trial court erred in denying their motion for summary judgment and their motions to disregard jury findings and for a judgment notwithstanding the verdict ("JNOV").

We affirm.

## Background

In its original petition, Ashby LLP alleged that in July 2010, Amerjin signed a contract—a contingency-fee agreement ("Contract 1")—under which Ashby LLP agreed to represent Amerjin in a suit against Sandia Drilling Co., Ltd, LLP ("Sandia"), then pending in the 113th Judicial District Court of Harris County, Texas (the "Sandia lawsuit"). In exchange for Ashby LLP's representation, Amerjin assigned and agreed to pay Ashby LLP a percentage of any recovery obtained by Amerjin. Contract 1 stated:

> In consideration of the services rendered by [Ashby LLP], [Amerjin] hereby ASSIGNS and CONVEYS to Ashby LLP, as compensation for its service, the following interest in any and all recovery obtained on behalf of [Amerjin]:
>
> **40% if settled at any time <u>before entry of judgment</u>;**
> **45% of any settlement or recovery made <u>after entry of a judgment</u>.**
>
> [Amerjin] understands that the interest hereinabove conveyed and assigned is calculated on gross recovery, prior to the deduction of expenses or taxes of any kind.

In accordance with Contract 1, Ashby LLP "took on representation of Amerjin in the [Sandia] [l]awsuit" by providing legal services, trying the case to a jury,

2

prosecuting Amerjin's case against Sandia, and defending Amerjin against Sandia's counterclaims. Ultimately, the trial of the Sandia lawsuit ended in a mistrial.

Ashby LLP further alleged that after the mistrial, Amerjin sought to file bankruptcy and hired another law firm, Tow & Koenig, PLLC ("Tow & Keonig"), to do so. While Amerjin's bankruptcy proceeding was pending, Ashby LLP, helped by Julie Koenig, Amerjin's bankruptcy attorney, negotiated a settlement of the Sandia lawsuit. Because of Contract 1, Ashby LLP was thus entitled to forty percent of what Amerjin recovered in the settlement of the Sandia lawsuit. Later, Amerjin refused to pay Ashby LLP the amount owed under Contract 1.

Ashby LLP sued Amerjin for breach of contract, quantum meruit, unjust enrichment, fraud, tortious interference with a contract, fraudulent transfer, and conspiracy. As for its breach-of-contract claim, Ashby LLP alleged that under Contract 1, Ashby LLP agreed to provide legal services to Amerjin, Ashby LLP provided such services to Amerjin, and Amerjin breached Contract 1 by failing to pay Ashby LLP after it settled the Sandia lawsuit. Ashby LLP sought damages and attorney's fees.

In their second amended answer and counterclaims, appellants generally denied the allegations in Ashby LLP's petition and asserted various affirmative defenses. Appellants also brought certain counterclaims against Ashby LLP, alleging that on July 9, 2010, Amerjin and Ashby LLP entered into Contract 1—a

3

contingency-fee agreement—under which Ashby LLP agreed to represent Amerjin in the Sandia lawsuit. Ashby LLP also entered into a separate contract—an hourly-fee agreement—with Zhu, the owner of Amerjin and Amerjin Energy ("Contract 2"). Under Contract 2, Ashby LLP was to represent and defend Zhu, in his personal capacity, in response to the counterclaim that Sandia had filed against him. According to appellants, on April 18, 2011, the trial of the Sandia lawsuit ended in a mistrial and "[n]o settlement or recovery was obtained."

Following the mistrial, Ashby LLP advised Amerjin to contact Tow & Koenig about filing for bankruptcy. Amerjin then signed a contract with Tow & Koenig to represent it in its bankruptcy proceeding in federal bankruptcy court. On June 9, 2011, Amerjin filed for bankruptcy. Because Ashby LLP was never listed as a creditor in Amerjin's bankruptcy proceeding, appellants alleged that it "thereby waiv[ed] any and all rights as a creditor."

Appellants further alleged that on August 2, 2011, "Amerjin settled its bankruptcy case with . . . who it understood to be its two main creditors, Sandia . . . and JP Morgan Chase Bank." Under that settlement agreement, Amerjin paid $508,551.39 to Sandia "to obtain a release of any claims from the facts underlying the Sandia [lawsuit] and $357,937 to JP Morgan Chase Bank." After finalizing the settlement agreement, Amerjin moved to dismiss the bankruptcy proceeding, identifying Sandia and JP Morgan Chase Bank as its two largest

4

creditors. On October 13, 2011, the bankruptcy court dismissed Amerjin's bankruptcy proceeding. And on March 26, 2012, the trial court in the Sandia lawsuit dismissed the entire suit.

Appellants asserted counterclaims against Ashby LLP for fraud, breach of fiduciary duty, breach of contract, and legal malpractice. As for their claim for breach of fiduciary duty, appellants asserted that Ashby LLP owed Amerjin a fiduciary duty and it breached that duty by "misrepresenting the nature of . . . [C]ontract [1], self-dealing, and taking advantage of [appellants'] trust." Ashby LLP further failed to inform Amerjin or Zhu that it intended to take a contingency fee "from anything beyond any recovery that resulted from the Sandia [lawsuit]." (Emphasis omitted.) According to appellants, the behavior by Ashby LLP directly and proximately caused injury to appellants.

Appellants moved for summary judgment, arguing, in part, that they were entitled to judgment on Ashby LLP's breach-of-contract claim as a matter of law because Ashby LLP did not "achieve a 'recovery' or 'judgment' in the Sandia [lawsuit]." Although Ashby LLP responded to appellants' summary-judgment motion, the record does not reflect a ruling by the trial court.

At trial, the trial court admitted into evidence a copy of Contract 1, signed on July 9, 2010 by Christopher Ashby ("Ashby") and Zhu, on behalf of Amerjin. Contract 1 states that it is between Ashby LLP and Amerjin related to "Cause No.

5

2009-21712; Amerjin Co., LLC vs. Sandia Drilling Co., Ltd, LLP; in the 113th Judicial District Court of Harris County, Texas." And it provides:

> In consideration of the services rendered by [Ashby LLP], [Amerjin] hereby ASSIGNS and CONVEYS to Ashby LLP, as compensation for its service, the following interest in any and all recovery obtained on behalf of [Amerjin]:
>
> **40% if settled at any time <u>before entry of judgment;</u>**
> **45% of any settlement or recovery made <u>after entry of a judgment.</u>**
>
> [Amerjin] understands that the interest hereinabove conveyed and assigned is calculated on gross recovery, prior to the deduction of expenses or taxes of any kind.

The trial court also admitted into evidence a copy of Contract 2, signed on July 9, 2019 by Ashby and by Zhu, personally, on his own behalf. Contract 2 states that it is between Ashby LLP and Zhu related to "Cause No. 2009-21712; Amerjin Co., [LLC] vs. Sandia Drilling Co., Ltd, LLP; in the 113th Judicial District Court of Harris County, Texas." And it provides:

> <u>Fees</u>. The principal factor [Ashby LLP] will utilize to determine the amount of [Zhu's] fee is the amount of time spent in connection with [Ashby LLP's] representation of . . . Zhu. [Ashby LLP's] rate for attorneys handling this matter is $350.00 per hour for partners, from $275.00 – $325.00 per hour for associates. In an effort to provide [Zhu] with cost-effective legal services, [Ashby LLP] may use the services of a legal assistant or other support personnel where possible to perform routine tasks such as document organization and review, as well as other tasks that do not require the attention of an attorney. [Ashby LLP's] rates for legal assistants and other support personnel are $100.00 per hour.

The trial court also admitted into evidence a copy of a third contract—an hourly-fee agreement—between Ashby LLP and Amerjin, signed on April 21, 2011 by Ashby and Zhu, on behalf of Amerjin ("Contract 3"). Contract 3 states that it relates to "Amerjin Co., LLC Corporate Matters," and it provides:

> Fees. The principal factor [Ashby LLP] will utilize to determine the amount of [Amerjin's] fee is the amount of time spent in connection with [Ashby LLP's] representation of Amerjin . . . . [Ashby LLP's] rate for attorneys handling this matter is $450.00 – $400.00 per hour for partners and attorneys of counsel, and $375.00 – $325.00 per hour for associates. In an effort to provide [Amerjin] with cost-effective legal services, [Ashby LLP] may use the services of a legal assistant or other support personnel where possible to perform routine tasks such as document organization and review, as well as other tasks that do not require the attention of an attorney. [Ashby LLP's] rates for legal assistants and other support personnel are $100.00 per hour.

Finally, the trial court admitted into evidence a copy of a fourth contract—an hourly-fee agreement—between Ashby LLP and Zhu, personally ("Contract 4"). Ashby and Zhu, on his own behalf, signed Contract 4 on June 21, 2011. Contract 4 states that it relates to "[Cause] No. 2009-21712; Amerjin Co., LLC vs. Sandia Drilling Co., Ltd, LLP; in the 113th Judicial District Court of Harris County, Texas," and it provides:

> Fees. The principal factor [Ashby LLP] will utilize to determine the amount of [Zhu's] fee is the amount of time spent in connection with [Ashby LLP's] representation of . . . Zhu. [Ashby LLP's] rate for attorneys handling this matter is $450.00 – $400.00 per hour for partners and attorneys of counsel, and $375.00 – $325.00 per hour for associates. In an effort to provide [Zhu] with cost-effective legal services, [Ashby LLP] may use the services of a legal assistant or other support personnel where possible to perform routine tasks such as

7

document organization and review, as well as other tasks that do not require the attention of an attorney. [Ashby LLP's] rates for legal assistants and other support personnel are $100.00 per hour.

At trial, Ashby explained about the facts of the underlying Sandia lawsuit. According to Ashby, Amerjin and Sandia executed a contract under which Sandia had agreed to pay Amerjin $10 million for six shipments of pipe. Sandia ultimately paid Amerjin $6.7 million for five of the six shipments of pipe, but it did not pay for the sixth shipment. As a result, Amerjin sold the sixth shipment to a third party for a loss.

A dispute also arose between Amerjin and Sandia over another one of the six shipments of pipe. Amerjin was holding a certain shipment of pipe, worth around $1.7 million, at a storage yard and refused to release it to Sandia, even though Sandia had paid for it.[1] According to Ashby, when Amerjin and Sandia got into the dispute over the sixth shipment of pipe, Zhu prevented Sandia "from getting [Sandia's] pipe" that it had paid for.[2] Although Ashby advised Zhu to release Sandia's pipe, Zhu "repeatedly said [that] he wanted to sell it."

In the Sandia lawsuit, Amerjin sued Sandia, seeking storage and transportation costs for Sandia's pipe that remained in its possession as well as the

---

[1]     For clarity purposes, in this memorandum opinion, we will refer to this shipment of pipe as "Sandia's pipe."

[2]     The trial court admitted into evidence a copy of Sandia's Second Amended Original Answer filed in the Sandia lawsuit, which states that on February 24, 2009, Amerjin prevented Sandia from removing pipe from certain storage yards.

8

money from Sandia for the sixth shipment of pipe that it had never paid. This totaled about $1.5 million.[3] Sandia, in response, brought counterclaims against Amerjin and Zhu, personally, "for holding [Sandia's] pipe," and it sought money damages. According to Ashby, no matter what happened in the Sandia lawsuit—even if Amerjin recovered on all of its claims and Sandia recovered nothing on its counterclaims—Sandia would still be entitled to Sandia's pipe that Amerjin had been improperly holding at a storage yard because Amerjin had no right to it.

Ashby further testified that Ashby LLP entered into two contracts related to the Sandia lawsuit—one with Amerjin and one with Zhu, personally—because Amerjin and Zhu were two separate parties involved in the Sandia lawsuit. According to Ashby, although the Sandia lawsuit was filed in 2009, Ashby LLP did not begin representing Amerjin or Zhu until July 2010. In summer 2010, Zhu first approached Ashby LLP about representing Amerjin on a contingency-fee basis related to the Sandia lawsuit. Zhu also approached Ashby LLP about defending him, personally, from the counterclaim that Sandia had asserted against him in the suit.

---

[3] The trial court admitted into evidence a copy of Amerjin's Second Amended Original Petition filed in the Sandia lawsuit. Amerjin brought claims against Sandia for breach of contract, quantum meruit, fraud, conversion, promissory estoppel, and equitable relief and sought damages of $1.5 million for "the difference between the resale price" of the sixth shipment of pipe and the contract price and additional "damages for storage and transportation of" pipe.

Ashby explained that Contract 1 was an agreement under which Ashby LLP agreed to represent Amerjin in the Sandia lawsuit. Contract 2 was an agreement under which Ashby LLP agreed to represent Zhu, personally, in the Sandia lawsuit. Ashby LLP performed work under both Contract 1 and Contract 2 related to the Sandia lawsuit.[4]

According to Ashby, in July 2010, when Ashby LLP entered into Contract 1 with Amerjin, Ashby sent the contract to Zhu to review on Amerjin's behalf and he then met with Zhu in person so that he could answer any questions. At that time, Ashby went through Contract 1 "paragraph by paragraph" with Zhu, "summarizing what it sa[id]."[5] Ashby explained to Zhu the percentage that Ashby LLP would receive "if [it was to] settle [the Sandia lawsuit] before there[] [was] a judgment" or "what [would] happen[] if it [went] to judgment." Zhu agreed, on behalf of Amerjin, with the contingency-fee percentage that Ashby LLP had proposed in Contract 1. Ashby did not have any difficulty communicating with Zhu, as Zhu was sophisticated and had negotiated multi-million-dollar contracts. Zhu was not under

---

[4]     Ashby also testified that Contract 3 was an agreement between Ashby LLP and Amerjin under which Ashby LLP was to aid in the creation of Amerjin Energy; it did not relate to the Sandia lawsuit. Contract 4 was an agreement under which Ashby LLP agreed to represent Zhu, personally, in the Sandia lawsuit, and that contract changed the hourly-rate to be charged to Zhu, thereby constituting a continuation of Contract 2.

[5]     Ashby went through this same process related to Contracts 2, 3, and 4.

any pressure or duress when he signed Contract 1; and the trial for the Sandia lawsuit was not imminent when the parties entered into Contract 1.

Related to the terms of Contract 1, Ashby testified that the agreement "use[d] very global language" and stated that Ashby LLP was entitled to a percentage of "any and all recovery" obtained on behalf of Amerjin. (Internal quotations omitted.) Thus, if Ashby LLP settled the Sandia lawsuit then it was entitled to forty percent of what Amerjin recovered; that was "very clear" under the terms of Contract 1. Contract 1 conveyed Ashby LLP an interest in any recovery by Amerjin in the Sandia lawsuit.

In April 2011, the trial of the Sandia lawsuit ended with a mistrial. At that time, Zhu informed Ashby that the manufacturers of the pipe at issue in the suit "would not understand a mistrial," "they wanted to be paid," and Amerjin "had other creditors . . . coming after [it]." Because Zhu expressed concern that Amerjin did not have money to pay its creditors, Ashby suggested that Zhu meet with a bankruptcy attorney.[6] Ashby noted that, although the Sandia lawsuit had ended in a mistrial, Ashby LLP intended to try the case again for Amerjin—Ashby LLP did not "fire" Amerjin as a client.

---

[6] At the time that Amerjin filed for bankruptcy, Zhu told Ashby that Amerjin only had $45,000 in its account.

On June 9, 2011, Amerjin filed for bankruptcy. But despite initiating the bankruptcy proceeding, Contract 1 between Ashby LLP and Amerjin did not go "away."[7] Ashby explained to Zhu that even though Amerjin had filed for bankruptcy, the Sandia lawsuit could be removed to federal court for "an adversarial proceeding with the bankruptcy court" and Ashby LLP would continue to represent Amerjin in that adversarial proceeding on a contingency-fee basis.

Ashby further testified that, unknown to him or Koenig—Amerjin's bankruptcy attorney—in April 2011, Zhu sold Sandia's pipe, which Sandia had paid Amerjin for, to a third party, T. Bob Amthor Company Inc. ("T. Bob"), for around $1.7 million.[8] Zhu transferred about $500,000 of this money from Amerjin to Amerjin Energy. Yet, according to Ashby, after Amerjin sold Sandia's pipe, Sandia was entitled to the money that Amerjin had received from the sale.

---

[7]     Ashby explained that Ashby LLP was not a creditor of Amerjin's during the bankruptcy proceeding because at the time that Amerjin filed for bankruptcy, and throughout the bankruptcy proceeding, there had not been a settlement or judgment of the Sandia lawsuit, which is what would have entitled Ashby LLP to a percentage of Amerjin's recovery. Further, Amerjin's bankruptcy proceeding was not discharged, it was dismissed, so "[e]very debt Amerjin had, except for the ones [that] settled, . . . continue[d]" after the bankruptcy proceeding ended.

[8]     A copy of an invoice admitted into evidence at trial shows that Amerjin, on April 30, 2011, sold certain "[c]asing" and "[t]ubing" to T. Bob for $1,732,805.19. An initial payment was made to Amerjin from T. Bob on April 28, 2011 for $876,902.60, and a second payment was made to Amerjin from T. Bob on June 15, 2011 for $831,967.72. It appears that certain adjustments were made to the price due to certain rejected pipe.

12

On August 2, 2011, Amerjin and Sandia entered into a "Settlement and Release Agreement." A copy of the Settlement and Release Agreement was admitted into evidence at trial. It states:

> WHEREAS, [Amerjin] and Sandia are parties to a case pending in the 113th Judicial District, Harris County, Texas, styled as Amerjin Co., LLC v. Sandia Drilling Co., Ltd. L.L.P., and hearing case number 2009-21712 (the "State Court Litigation");
>
> WHEREAS, [Amerjin] and Sandia have asserted claims against one another in the State Court Litigation;
>
> WHEREAS, [Amerjin] and Sandia have each denied all of the allegations and claims made by the other in the State Court Litigation;
>
> . . . .
>
> WHEREAS, prior to the filing of the voluntary [bankruptcy] petition, [Amerjin] sold certain property (the "Property");
>
> WHEREAS, Sandia claims complete ownership of the Property;
>
> WHEREAS, [Amerjin] claims that the Property is property of [its] estate;
>
> . . . .
>
> WHEREAS, the proceeds of the sale of the Property are, to the extent not delivered to third parties prior to the filing of the voluntary [bankruptcy] petition, being held in [Amerjin's] bank account;
>
> . . . .
>
> WHEREAS, Sandia contends that the funds held in [Amerjin's] account belong to it;
>
> WHEREAS, [Amerjin and] Sandia . . . wish to resolve all issues and claims presently existing between them without the further

13

expenditure of time and other resources under the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the agreements and mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, [Amerjin and] Sandia[] . . . agree as follows:

AGREEMENT

1.

The funds currently held in [Amerjin's] bank account, totally $866,489.17 shall be immediately deposited in the client trust account maintained by Tow & Koenig.

2.

Within five (5) days of the entry of the later of an order approving this Agreement and an order dismissing [Amerjin's] bankruptcy case, Tow & Koenig will distribute the finds being held in its client trust account as follows:

. . . $508,551.39 to Sandia.[9]

. . . .

4.

In consideration for the aforementioned payment and except as explicitly set forth herein, Sandia . . . release[s] and discharge[s] [Amerjin] . . . and Zhu[,] individually and in his capacity as President and owner of Amerjin[,] . . . of and from any and all manner of claims,

---

9    Ashby testified that Amerjin did not "pay" Sandia this money. Rather, $508,551.39 was distributed to Sandia because it was always Sandia's money—it was a portion of the money received from the sale of Sandia's pipe. In other words, "Sandia [was to get] approximately $500,000 of its money returned to it"; under the Settlement and Release Agreement, Sandia merely received a portion of what it already owned because it had paid for Sandia's pipe but had never received it from Amerjin.

liens, liabilities, damages, costs, expenses, and/or causes of action that . . . Sandia . . . may now have or which may hereafter accrue on account of, rising out of, or in any way related to the claims and/or causes of action that were actually asserted in the State Court Litigation or that could have been asserted therein, known or unknown, and whether arising by contract, under tort law, or by any state or federal statute granting a cause of action, which include but are not limited to negligence, contract, warranty, claims under the Uniform Commercial Code, liens, gross negligence, malice, tort, intentional tort, conversion, wrongful detention, interference with present or future business and contractual relations, conspiracy, and any other law, statute, regulation, or theory of law or equity which permits or allegedly permits recovery of any form of monetary or other damages or relief, which claims whatsoever in nature, whether in contract or in tort and/or any claim related to any lien on any of Amerjin's property.

5.

In consideration for the aforementioned release and except as explicitly set forth herein, [Amerjin] and . . . Zhu, individually[,] . . . release and discharge [Sandia] . . . of and from any and all manner of claims, liens, liabilities, damages, costs, expenses, and/or causes of action that . . . [Amerjin] and/or . . . Zhu may now have or which may hereafter accrue on account of, rising out of, or in any way related to the claims and/or causes of action that were actually asserted in the State Court Litigation or that could have been asserted therein, known or unknown, and whether arising by contract, under tort law, or by any state or federal statute granting a cause of action, which include but are not limited to negligence, contract, warranty, claims under the Uniform Commercial Code, liens, gross negligence, malice, tort, intentional tort, conversion, wrongful detention, interference with present or future business and contractual relations, conspiracy, and any other law, statute, regulation, or theory of law or equity which permits or allegedly permits recovery of any form of monetary or other damages or relief, which claims whatsoever in nature, whether in contract or in tort and/or any claim related to any lien on any of Amerjin's property.

15

Within three (3) days of the receipt by Sandia, [Amerjin] and Sandia shall file a joint notice of dismissal with prejudice, each party to bear its own costs, of all of their claims against each other in the State Court Litigation, known or unknown, and whether arising by contract, under tort law or by any state or federal statute granting a cause of action . . . .

. . . .

10.

Upon receipt of the distribution[] contemplated herein and the dismissal with prejudice of [Amerjin's] claims, Sandia will file a motion dismissing all of its claims against [Amerjin] in the State Court Litigation with prejudice.

Ashby testified that he negotiated the settlement agreement between Sandia, Amerjin, and Zhu. And Ashby told Zhu that Ashby LLP would be entitled to forty percent of Amerjin's recovery under the Settlement and Release Agreement. Ashby also discussed the Settlement and Release Agreement fully with Zhu and explained that Amerjin would recover $1.2 million, while Sandia would recover around $500,000. On October 13, 2011, the bankruptcy court approved the settlement, Amerjin's bankruptcy proceeding was dismissed, and the Settlement and Release Agreement became effective.

Ashby explained that "recovery," related to the Sandia lawsuit, as referenced in Contract 1, occurred when there was an agreement between Amerjin and Sandia to settle the suit and Amerjin obtained a legal right to the $1.2 million that it had

received from the sale of Sandia's pipe "free and clear." According to Ashby, Amerjin sold Sandia's pipe to T. Bob for $1.7 million, even though Sandia had paid Amerjin for that pipe. Once Amerjin and Sandia signed the Settlement and Release Agreement, under which Amerjin would keep $1.2 million of Sandia's money, "recovery" as for Contract 1 was achieved. In other words, "Amerjin recovered $1.2 million from the settlement" of the Sandia lawsuit. The selling of Sandia's pipe and the recovery by Amerjin of some proceeds from that sale falls under the "any and all recovery" provision of Contract 1. (Internal quotations omitted.)

Ashby further testified that after negotiating and signing the Settlement and Release Agreement, Ashby told Zhu that Ashby LLP was entitled to forty percent of Amerjin's $1.2 million recovery or around $480,000. In response, Zhu did not say that Ashby LLP had no right to its fee or that Ashby LLP did not settle the Sandia lawsuit; Zhu knew that Amerjin owed Ashby LLP forty percent and he still wanted to proceed with the settlement. As for why Amerjin had not paid Ashby LLP, Zhu simply told Ashby that Amerjin did not have money to pay the fee. Ashby LLP was never paid for its services in representing Amerjin in the Sandia lawsuit, and Ashby LLP never told Amerjin that it would not seek its contingency-fee related to its work for the Sandia lawsuit. According to Ashby, Ashby LLP was entitled to $480,124.77 based on the terms of Contract 1 and the amount of Amerjin's recovery under the Settlement and Release Agreement.

17

Koenig testified that she became familiar with Amerjin in 2011 when Ashby asked her to meet with Zhu about the possibility of filing for bankruptcy. In May 2011, Koenig learned that Amerjin still possessed Sandia's pipe. And when Amerjin's bankruptcy petition was filed on June 9, 2011, Koenig did not know that Amerjin had any accounts receivable or inventory; instead, she believed that Amerjin only had $45,000 in "cash on hand." Koenig later learned that Sandia's pipe had been sold to T. Bob and Amerjin had received $1.7 million from that sale. Koenig had to disclose this to the federal bankruptcy court.

As for the Sandia lawsuit, Koenig explained that the suit was stayed upon Amerjin's filing for bankruptcy and she originally planned to have the Sandia lawsuit removed from state court to federal bankruptcy court so that "everything" could be tried together, with the aid of Ashby LLP. Ultimately, however, a settlement was "worked out" with Sandia, with Ashby mainly negotiating the settlement agreement. On October 13, 2011, the bankruptcy court approved the Settlement and Release Agreement between Amerjin and Sandia, and Koenig distributed the money under the parties' agreement. Koenig noted that Ashby LLP had a contingency-fee agreement with Amerjin related to the Sandia lawsuit, she knew that Ashby LLP would seek its fees pursuant to that agreement, and Ashby LLP did not become a creditor of Amerjin's until the federal bankruptcy court

18

approved the Settlement and Release Agreement and dismissed Amerjin's bankruptcy proceeding.

Zhu testified that he was engaged in an importing and exporting business between the United States and China, and his father's company, Tianjin Time Powers Engineering and Trading Company, acted as his agent in China. Amerjin buys and sells tubular goods or pipe related to the oil and gas industry. Amerjin Energy is in the business of oil field parts, such as couplings, fittings, and accessories.

As for the underlying facts of the Sandia lawsuit, Zhu explained that Sandia had agreed to pay Amerjin $10 million for pipe, but it ultimately only paid $6.7 million. In 2009, Amerjin received the sixth shipment of pipe, but Sandia refused to pay the $3.38 million that it had agreed before to pay for that shipment. Amerjin then stored the sixth shipment of pipe for about a year before selling it to a third party for $2.1 million. In the Sandia lawsuit, Amerjin sought to recover around $1.2 million from Sandia for the sixth shipment of pipe along with some costs for storage and transportation.

Zhu also explained that the sixth shipment of pipe was not the same as "Sandia's pipe" which Amerjin sold to T. Bob in 2011.[10] Although Amerjin sold

---

[10] According to Zhu, Sandia did not completely pay for Sandia's pipe; it still owed Amerjin $80,000 for it.

19

Sandia's pipe, Zhu did understand that even if Amerjin prevailed in the Sandia lawsuit that Amerjin had no right to keep Sandia's pipe. That said, Zhu sold Sandia's pipe in April 2011 to T. Bob for around $1,786,000 because it was losing value and he had bills to pay.[11] Amerjin transferred $500,000 of the money it received from the sale of Sandia's pipe to Amerjin Energy, a "business separate from Amerjin." At that time, Amerjin did not owe any money to Amerjin Energy. Zhu's father in China received a $50,000 payment from Amerjin Energy. By transferring money from Amerjin to Amerjin Energy, Zhu knew that the money would not "be available to pay [the] debts of Amerjin" in its bankruptcy proceeding.[12]

Zhu further testified that the Sandia lawsuit began in 2009, and he eventually sought out Ashby LLP to represent Amerjin in the suit on a contingency-fee basis. Amerjin and Ashby LLP signed Contract 1 in July 2010. In the Sandia lawsuit, Amerjin asserted claims against Sandia, and Sandia asserted counterclaims against Amerjin and Zhu, personally. In its counterclaims, Sandia alleged that Zhu had "stole[n]" Sandia's pipe. When the trial in the Sandia lawsuit resulted in a mistrial, Ashby LLP, according to Zhu, did not want to retry the case, but it did not "quit." And Zhu agreed to have Ashby LLP keep working on the Sandia lawsuit even while

---

[11]    According to Zhu, Ashby LLP had told him that Sandia's pipe was actually Amerjin's pipe and he was not told that he would be committing conversion if he sold Sandia's pipe.

[12]    In contrast, Zhu also testified that he was not transferring money to Amerjin Energy to "hide [it] from the [federal] bankruptcy court."

Amerjin was involved in its bankruptcy proceeding. Zhu acknowledged that Ashby LLP "spent time on the [Sandia lawsuit]" and that Zhu wanted Ashby LLP to have compensation. That said, after Amerjin's bankruptcy proceeding was complete, Amerjin did not have any money to pay Ashby LLP.

Zhu also testified that Koenig—Amerjin's bankruptcy attorney—was the person who settled the Sandia lawsuit on behalf of Amerjin and Zhu, personally. But Zhu acknowledged that if Ashby LLP had settled the Sandia lawsuit, then it would have been entitled to forty percent of Amerjin's recovery under Contract 1. Zhu signed the Settlement and Release Agreement, and as part of the settlement agreement, Amerjin could keep $1.2 million of the money it had received from the sale of Sandia's pipe to T. Bob, which Zhu then used to pay certain bills. After signing the Settlement and Release Agreement, Ashby LLP asked Amerjin for compensation, but it did not tell Zhu the amount that it was owed.

Zhu also explained that Ashby LLP fought to have Zhu released from liability personally in the settlement documents eventually filed in the trial court related to the Sandia lawsuit. And Ashby LLP reviewed a "settlement draft" related to the Sandia lawsuit. After the parties in the Sandia lawsuit settled, the case was dismissed by the trial court in March 2012. According to Zhu, although he hired Ashby LLP to defend him personally in the Sandia lawsuit and Ashby LLP represented him,

personally, in the Sandia lawsuit, Ashby LLP never sent him a bill for representing Zhu's personal interests.

The jury found for Ashby LLP on its breach-of contract claim against appellants,[13] and it awarded Ashby LLP $480,124.77 in damages as well as attorney's fees. The jury also found for Ashby LLP on appellants' counterclaims. As for appellants' breach-of-fiduciary-duty counterclaim, the jury found that Ashby LLP did not breach its fiduciary duty to Amerjin.

Ashby LLP then moved for judgment based on the jury's findings, requesting that judgment be rendered in favor of Ashby LLP and that appellants take nothing on their counterclaims against it. Appellants responded, arguing that no evidence supported Ashby's breach-of-contract claim because "there was no settlement within the meaning of . . . [C]ontract [1]," "there was no net recovery," and so, there was no evidence of a breach of Contract 1.

Appellants filed their first motion to disregard jury findings and for JNOV, asserting, in part, that the trial court should disregard the jury's finding that Amerjin breached Contract 1 and enter a take nothing judgment on Ashby LLP's breach-of-contract claim because no evidence supported the jury's finding that Amerjin breached Contract 1 as Amerjin's "duty to pay [Ashby LLP] never arose."

---

[13]  The jury found that Amerjin Energy and Zhu, personally, were both responsible for the conduct of Amerjin.

22

According to appellants, there was no settlement within the meaning of Contract 1 and Amerjin never had "any recovery"—Amerjin had to "pay money"; and, thus, there could never have been a breach of Contract 1 by Amerjin.

The trial court entered judgment in favor of Ashby LLP on its breach-of-contract claim, and in doing so, it awarded Ashby LLP $480,124.77 in actual damages, plus prejudgment interest, and attorney's fees.

Appellants then filed a second motion to disregard jury findings and for JNOV, reasserting that the trial court should disregard the jury's finding that Amerjin breached Contract 1 and enter a take nothing judgment on Ashby LLP's breach-of-contract claim. Along with rearguing that the trial court "should enter a judgment in [appellants'] favor and against Ashby [LLP]" on Ashby LLP's breach-of-contract claim because there was no evidence of a breach, appellants asserted that "the evidence adduced at trial conclusively established that any recovery" by Ashby LLP on its breach-of-contract claim was "barred by Amerjin's affirmative defenses of failure of condition precedent, waiver, and quasi-estoppel." And appellants asserted that "there was never any 'recovery' within the meaning of" Contract 1 that would have triggered Amerjin's duty to pay Ashby LLP.[14]

---

[14]    Appellants also asserted that Ashby LLP did not inform them "of its intent to collect the contingency fee following the . . . mistrial" in the Sandia lawsuit and "did not inform [appellants] of its interest in the bankruptcy settlement." Thus, "[i]t would be unconscionable to allow Ashby [LLP] to recover now when it took a completely different position in the bankruptcy proceeding to Amerjin's detriment," and Ashby

Appellants also asserted in their motion that the trial court should disregard the jury's findings on its counterclaim against Ashby LLP for breach of fiduciary duty and enter judgment in their favor on the counterclaim because the evidence conclusively established that Ashby LLP obtained a benefit from Amerjin and that Ashby LLP breached its fiduciary duty to Amerjin by misrepresenting Contract 4, by not informing Amerjin and Zhu that Ashby LLP would "be paid by the hour," yet also "intend[ing] to take a contingency fee," engaging in self-dealing, taking advantage of appellants' trust, and not disclosing "conflicts of interest." After Ashby LLP responded, the trial court denied appellants' second motion to disregard jury findings and for JNOV.

## Summary Judgment

In a portion of their first issue, appellants argued that the trial court erred in denying their motion for summary judgment because Ashby LLP had no right to recover on its breach-of-contract claim against appellants as a matter of law. Appellants assert that there was no breach of Contract 1 because the agreement did not "expressly set forth [that Ashby LLP] was assigned an interest in a recovery of non-cash benefits."

LLP "waived its right to recover under Contract 1 because it failed to assert its claims under that agreement during" Amerjin's bankruptcy proceeding.

24

To preserve a complaint for appellate review about the trial court's ruling on a particular motion, the record must show that the trial court ruled on the motion. *See* TEX. R. APP. P. 33.1(a); *Cantu v. Frye & Assocs.*, No. 01-12-00868-CV, 2014 WL 2626439, at *13 (Tex. App.—Houston [1st Dist.] June 12, 2014, no pet.) (mem. op.); *Williams v. Vought*, 68 S.W.3d 102, 115 (Tex. App.—Dallas 2001, no pet.).

Here, the record does not reflect a ruling by the trial court on appellants' summary-judgment motion. Thus, we hold that any complaint about the trial court's purported denial of appellants' motion is not preserved for appellate review. *See* TEX. R. APP. P. 33.1(a); *Williams*, 68 S.W.3d at 115; *Coastal Cement Sand Inc. v. First Interstate Credit Alliance, Inc.*, 956 S.W.2d 562, 572 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). Still yet, even if appellants had preserved their complaint, we note that after a trial on the merits, the denial of a motion for summary judgment may not be reviewed on appeal. *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966); *Tricon Tool & Supply, Inc. v. Thumann*, 226 S.W.3d 494, 508–09 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (holding when party moves unsuccessfully for summary judgment and subsequently loses in trial on merits, denial of motion generally not subject to review on appeal). Thus, we do not address this portion of appellants' first issue.

**Breach of Contract**

In another portion of their first issue, appellants argue that the trial court erred in denying their motions to disregard jury findings and for JNOV on Ashby LLP's breach-of-contract claim because Contract 1 "does not expressly set forth [that Ashby LLP] was assigned an interest in a recovery of non-cash benefits." In their third issue, appellants argue that the trial court erred in denying their second motion to disregard jury findings and for JNOV on Ashby LLP's breach-of-contract claim because Contract 1 was "voidable as a matter of law and should otherwise be unenforceable on the basis of public policy," as "it contains a clause prohibiting Amerjin from settling without Ashby[] [LLP's] consent" in violation of the Texas Disciplinary Rules of Professional Conduct.

A trial court may disregard a jury's verdict and render a JNOV if no evidence supports the jury's findings or if a directed verdict would have been proper. TEX. R. CIV. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 15 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We review a challenge to a trial court's ruling on a motion for JNOV under a legal-sufficiency standard. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review."). We will uphold a trial court's JNOV based on "no evidence" when the

record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the trial court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810.

"If more than a scintilla of evidence supports the jury's finding[], the jury's verdict[,] and not the trial court's judgment[,] must be upheld." *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003); *see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). In determining whether more than a scintilla of evidence exists, we review only the evidence supporting the jury's verdict and disregard all evidence and inferences to the contrary. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227–28 (Tex. 1990). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (internal quotations omitted). Evidence that is "so weak as to do no more than create a mere surmise," however, is no more than a scintilla and thus no evidence. *Id.* (internal quotations omitted).

When reviewing the evidence for legal sufficiency, we assume that jurors decided questions of credibility or conflicting evidence in favor of the finding if they

27

reasonably could do so. *City of Keller*, 168 S.W.3d at 819. We do not substitute our judgment for that of the factfinder if the evidence falls within this zone of reasonable disagreement. *Id.* at 822.

We do not consider unpreserved issues on appeal. *See Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 604 (Tex. 2012); *see also Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240 (Tex. 1987) ("A point of error not preserved, is not before the appellate court for review."). Generally, to preserve a complaint for appellate review, the complaining party must present the complaint to the trial court by timely request, objection, or motion. TEX. R. APP. P. 33.1(a). A party's argument on appeal must comport with the complaint made in the trial court. *See Patel v. Hussain*, 485 S.W.3d 153, 174 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The complaint raised in the trial court must state the grounds for the ruling sought "with sufficient specificity to make the trial court aware of the complaint." TEX. R. APP. P. 33.1(a); *see also Hussain*, 485 S.W.3d at 174; *Chappell Hill Bank v. Lane Bank Equip. Co.*, 38 S.W.3d 237, 246–47 (Tex. App.—Texarkana 2001, pet. denied) ("[J]udicial economy requires that issues be raised first in the trial court in order to spare the parties and the public the expense of a potentially unnecessary appeal.").

In a portion of their first issue, appellants argue that the trial court erred in denying their motions to disregard jury findings and for JNOV on Ashby LLP's breach-of-contract claim because Contract 1 "does not expressly set forth [that

28

Ashby LLP] was assigned an interest in a recovery of non-cash benefits." Appellants, however, did not make this argument in either of their motions to disregard jury findings and for JNOV that were filed in the trial court.

And in their third issue, appellants argue that the trial court erred in denying their second motion to disregard jury findings and for JNOV on Ashby LLP's breach-of-contract claim because Contract 1 was "voidable as a matter of law and should otherwise be unenforceable on the basis of public policy" as "it contains a clause prohibiting Amerjin from settling without Ashby[] [LLP's] consent" in violation of the Texas Disciplinary Rules of Professional Conduct. Appellants did not make this argument in their second motion to disregard jury findings and for JNOV filed in the trial court.[15]

Thus, we hold that appellants have not preserved the above portion of their first issue or their third issue for appellate review.[16] *See* TEX. R. APP. P. 33.1(a); *see,*

---

[15]    Appellants also did not make this argument in their first motion to disregard jury findings and for JNOV.

[16]    To the extent that appellants attempt to raise any new issues in their reply briefing, we also do not consider them. *See Zamarron v. Shinko Wire Co.*, 125 S.W.3d 132, 139 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Additionally, to the extent that appellants, in their reply briefing, continue to present arguments that were not raised in their motions to disregard jury findings and for JNOV, we hold that they are not preserved for appellate review. *See* TEX. R. APP. P. 33.1(a); *see, e.g.*, *Mattar v. BBVA Compass Bank, NA*, No. 13-16-00496-CV, 2018 WL 2440382, at *11 (Tex. App.—Corpus Christi–Edinburg May 31, 2018, no pet.) (mem. op.) (complaint trial erred in denying motion for JNOV not preserved, where motion did not mention argument raised on appeal); *Scarbrough v. Purser*, No. 03-13-00025-CV, 2016 WL 7583546, at *23 (Tex. App.—Austin Dec. 30, 2016, pet. denied) (mem. op.) (argument on appeal not raised in motion for JNOV); *B & W*

*e.g.*, *Mattar v. BBVA Compass Bank, NA*, No. 13-16-00496-CV, 2018 WL 2440382, at \*11 (Tex. App.—Corpus Christi–Edinburg May 31, 2018, no pet.) (mem. op.) (complaint trial erred in denying motion for JNOV not preserved, where motion did not mention argument raised on appeal); *Scarbrough v. Purser*, No. 03-13-00025-CV, 2016 WL 7583546, at \*23 (Tex. App.—Austin Dec. 30, 2016, pet. denied) (mem. op.) (argument on appeal not raised in motion for JNOV); *B & W Supply, Inc.*, 305 S.W.3d at 20 (argument in motion for JNOV differed from argument asserted on appeal); *Lee v. Lee*, 47 S.W.3d 767, 776–77 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (refusing to consider appellate complaint which differed from complaint raised in motion for JNOV that no evidence supported jury's finding); *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 725 (Tex. App.—Waco 1998, pet. denied) (appellant could not challenge trial court's refusal to grant motion for JNOV on ground when he did not first ask trial court to render JNOV on that ground).

---

*Supply, Inc. v. Beckman*, 305 S.W.3d 10, 20 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (argument in motion for JNOV differed from argument asserted on appeal); *Lee v. Lee*, 47 S.W.3d 767, 776–77 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (refusing to consider appellate complaint which differed from complaint raised in motion for JNOV that there was no evidence to support jury's finding); *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 725 (Tex. App.—Waco 1998, pet. denied) (appellant could not challenge trial court's refusal to grant motion for JNOV on ground when he did not first ask trial court to render JNOV on that ground).

Despite the above, we note that appellants, in their motions to disregard the jury's findings and for JNOV, did argue that the trial court should disregard the jury's finding that Amerjin breached Contract 1 and enter a take nothing judgment on Ashby LLP's breach-of-contract claim because there was no settlement under Contract 1 and Amerjin never had "any recovery" related to the Sandia lawsuit—it had to "pay money." To the extent that appellants' appellate briefing related to their first issue can be read to include these arguments, we address them below.

At trial, Ashby testified that Amerjin and Sandia had entered into a contract under which Sandia agreed to pay Amerjin $10 million for six shipments of pipe. Sandia ultimately paid Amerjin $6.7 million for five of the six shipments of pipe, but it did not pay for the sixth shipment, which led Amerjin to sell it to a third party for a loss. A dispute also arose between Amerjin and Sandia over another one of the six shipments of pipe because Amerjin was holding a shipment of Sandia's pipe, worth around $1.7 million, at a storage yard and refusing to release it to Sandia, even though Sandia had paid for it.

Ashby further explained that in the Sandia lawsuit, Amerjin sued Sandia, seeking storage and transportation costs for Sandia's pipe that remained in its possession as well as the money from Sandia for the sixth shipment of pipe that Sandia had never paid. Amerjin's Second Amended Original Petition filed in the Sandia lawsuit, and admitted into evidence at trial, shows that Amerjin sued Sandia

for breach of contract, quantum meruit, fraud, conversion, promissory estoppel, and equitable relief and sought damages of $1.5 million for "the difference between the resale price" of the sixth shipment of pipe and the contract price and additional "damages for storage and transportation of" pipe. Sandia, in response, brought counterclaims against Amerjin and Zhu, personally, "for holding [Sandia's] pipe," and sought money damages.

Ashby also testified that, unknown to him, in April 2011, Zhu sold Sandia's pipe, for which Sandia had paid Amerjin, to T. Bob for around $1.7 million. Zhu then transferred about $500,000 of the money Amerjin received from the sale of Sandia's pipe to Amerjin Energy. According to Ashby, after Amerjin sold Sandia's pipe, Sandia was entitled to the money that Amerjin had received from the sale.

On August 2, 2011, Amerjin and Sandia entered into a "Settlement and Release Agreement." A copy of the Settlement and Release Agreement, admitted into evidence at trial, states:

> WHEREAS, [Amerjin] and Sandia are parties to a case pending in the 113th Judicial District, Harris County, Texas, styled as Amerjin Co., LLC v. Sandia Drilling Co., Ltd. L.L.P., and hearing case number 2009-21712 (the "State Court Litigation");
>
> WHEREAS, [Amerjin] and Sandia have asserted claims against one another in the State Court Litigation;
>
> WHEREAS, [Amerjin] and Sandia have each denied all of the allegations and claims made by the other in the State Court Litigation;
>
> . . . .

32

WHEREAS, prior to the filing of the voluntary [bankruptcy] petition, [Amerjin] sold certain property (the "Property");

WHEREAS, Sandia claims complete ownership of the Property;

WHEREAS, [Amerjin] claims that the Property is property of [its] estate;

. . . .

WHEREAS, the proceeds of the sale of the Property are, to the extent not delivered to third parties prior to the filing of the voluntary [bankruptcy] petition, being held in [Amerjin's] bank account;

. . . .

WHEREAS, Sandia contends that the funds held in [Amerjin's] account belong to it;

WHEREAS, [Amerjin and] Sandia . . . wish to resolve all issues and claims presently existing between them without the further expenditure of time and other resources under the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the agreements and mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, [Amerjin and] Sandia[] . . . agree as follows:

AGREEMENT

1.

The funds currently held in [Amerjin's] bank account, totally $866,489.17 shall be immediately deposited in the client trust account maintained by Tow & Koenig.

33

## 2.

Within five (5) days of the entry of the later of an order approving this Agreement and an order dismissing [Amerjin's] bankruptcy case, Tow & Koenig will distribute the finds being held in its client trust account as follows:

. . . $508,551.39 to Sandia.[17]

. . . .

## 4.

In consideration for the aforementioned payment and except as explicitly set forth herein, Sandia . . . release[s] and discharge[s] [Amerjin] . . . and Zhu[,] individually and in his capacity as President and owner of Amerjin[,] . . . of and from any and all manner of claims, liens, liabilities, damages, costs, expenses, and/or causes of action that . . . Sandia . . . may now have or which may hereafter accrue on account of, rising out of, or in any way related to the claims and/or causes of action that were actually asserted in the State Court Litigation or that could have been asserted therein, known or unknown, and whether arising by contract, under tort law, or by any state or federal statute granting a cause of action, which include but are not limited to negligence, contract, warranty, claims under the Uniform Commercial Code, liens, gross negligence, malice, tort, intentional tort, conversion, wrongful detention, interference with present or future business and contractual relations, conspiracy, and any other law, statute, regulation, or theory of law or equity which permits or allegedly permits recovery of any form of monetary or other damages or relief, which claims whatsoever in nature, whether in contract or in tort and/or any claim related to any lien on any of Amerjin's property.

---

[17] Ashby testified that Amerjin did not "pay" Sandia this money. Rather, $508,551.39 was distributed to Sandia because it was always Sandia's money—it was a portion of the money received from the sale of Sandia's pipe. In other words, "Sandia [was to get] approximately $500,000 of its money returned to it"; under the Settlement and Release Agreement, Sandia merely received a portion of what it already owned because it had paid for Sandia's pipe but had never received it from Amerjin.

5.

In consideration for the aforementioned release and except as explicitly set forth herein, [Amerjin] and . . . Zhu, individually . . . release and discharge [Sandia] . . . of and from any and all manner of claims, liens, liabilities, damages, costs, expenses, and/or causes of action that . . . [Amerjin] and/or . . . Zhu may now have or which may hereafter accrue on account of, rising out of, or in any way related to the claims and/or causes of action that were actually asserted in the State Court Litigation or that could have been asserted therein, known or unknown, and whether arising by contract, under tort law, or by any state or federal statute granting a cause of action, which include but are not limited to negligence, contract, warranty, claims under the Uniform Commercial Code, liens, gross negligence, malice, tort, intentional tort, conversion, wrongful detention, interference with present or future business and contractual relations, conspiracy, and any other law, statute, regulation, or theory of law or equity which permits or allegedly permits recovery of any form of monetary or other damages or relief, which claims whatsoever in nature, whether in contract or in tort and/or any claim related to any lien on any of Amerjin's property.

6.

Within three (3) days of the receipt by Sandia, [Amerjin] and Sandia shall file a joint notice of dismissal with prejudice, each party to bear its own costs, of all of their claims against each other in the State Court Litigation, known or unknown, and whether arising by contract, under tort law or by any state or federal statute granting a cause of action . . . .

. . . .

10.

Upon receipt of the distribution[] contemplated herein and the dismissal with prejudice of [Amerjin's] claims, Sandia will file a motion dismissing all of its claims against [Amerjin] in the State Court Litigation with prejudice.

35

Ashby testified that he negotiated the settlement agreement between Sandia, Amerjin, and Zhu. When Ashby discussed the Settlement and Release Agreement with Zhu, he explained that Amerjin would recover $1.2 million, while Sandia would recover around $500,000. Koenig also testified that a settlement was "worked out" between Amerjin and Sandia and Ashby mainly negotiated the settlement agreement.

As for Ashby LLP's contingency-fee agreement with Amerjin, Ashby testified that in summer 2010, Zhu approached Ashby LLP about representing Amerjin on a contingency-fee basis related to the Sandia lawsuit. And Contract 1 is the agreement under which Ashby LLP agreed to represent Amerjin in the Sandia lawsuit. Contract 1, signed on July 9, 2010 by Ashby and Zhu, on behalf of Amerjin, states that it is between Ashby LLP and Amerjin related to "Cause No. 2009-21712; Amerjin Co., LLC vs. Sandia Drilling Co., Ltd, LLP; in the 113th Judicial District Court of Harris County, Texas." Related to fees, Contract 1 provides:

> In consideration of the services rendered by [Ashby LLP], [Amerjin] hereby ASSIGNS and CONVEYS to Ashby LLP, as compensation for its service, the following interest in *any and all recovery obtained on behalf of [Amerjin]*:
>
> **40%  if settled at any time <u>before entry of judgment</u>;**
> **45%  of any settlement or recovery made <u>after entry of a judgment</u>.**
>
> [Amerjin] understands that the interest hereinabove conveyed and assigned is calculated on gross recovery, prior to the deduction of expenses or taxes of any kind.

36

(Second emphasis added.)

According to Ashby, when Ashby LLP entered into Contract 1 with Amerjin, Ashby sent the contract to Zhu to review on Amerjin's behalf and he then met with Zhu in person so that he could answer any questions. At that time, Ashby went through Contract 1 "paragraph by paragraph" with Zhu, "summarizing what it sa[id]." Ashby explained to Zhu the percentage that Ashby LLP would receive "if [it was to] settle [the Sandia lawsuit] before there[] [was] a judgment" or "what [would] happen[] if it [went] to judgment." Zhu agreed, on behalf of Amerjin, with the contingency-fee percentage that Ashby LLP proposed in Contract 1. Ashby did not have any difficulty communicating with Zhu, as Zhu was sophisticated and had negotiated multi-million-dollar contracts. Zhu was not under any pressure or duress when he signed Contract 1, and the trial for the Sandia lawsuit was not imminent when the parties entered into Contract 1.

Related to the terms of Contract 1, Ashby testified that the agreement "use[d] very global language" and stated that Ashby LLP was entitled to a percentage of "any and all recovery" obtained on behalf of Amerjin. (Internal quotations omitted.) According to Ashby, if Ashby LLP settled the Sandia lawsuit then it was entitled to forty percent of what Amerjin recovered; that was "very clear" under Contract 1. Contract 1 conveyed Ashby LLP an interest in any recovery by Amerjin in the Sandia lawsuit.

When Zhu, on behalf of Amerjin, entered into the Settlement and Release Agreement with Sandia, Ashby told Zhu that Ashby LLP would be entitled to forty percent of Amerjin's $1.2 million recovery, around $480,000. Ashby also discussed the Settlement and Release Agreement fully with Zhu, explained that Amerjin would recover $1.2 million, while Sandia would recover around $500,000.

Ashby testified that "recovery," related to the Sandia lawsuit, as referenced in Contract 1, occurred when there was an agreement between Amerjin and Sandia to settle the Sandia lawsuit and Amerjin obtained a legal right to the $1.2 million that it had ultimately received from the sale of Sandia's pipe "free and clear." In other words, once Amerjin and Sandia signed the Settlement and Release Agreement, under which Amerjin would keep $1.2 million of Sandia's money, "recovery" as for Contract 1 was achieved. According to Ashby, "Amerjin recovered $1.2 million from the settlement" of the Sandia lawsuit. The selling of Sandia's pipe and the recovery by Amerjin of some proceeds from that sale falls under the "any and all recovery" provision of Contract 1. (Internal quotations omitted.) Ashby LLP was entitled to $480,124.77 based on the terms of Contract 1 and the amount of Amerjin's recovery under the Settlement and Release Agreement.

Zhu, himself, testified that if Ashby LLP had settled the Sandia lawsuit, then it was entitled to forty percent of Amerjin's recovery under Contract 1. And under the Settlement and Release Agreement between Amerjin and Sandia, Amerjin could

38

keep $1.2 million of the money that it had received from the sale of Sandia's pipe to T. Bob. Zhu acknowledged that Ashby LLP had negotiated to have Zhu released personally in the settlement documents eventually filed in the trial court related to the Sandia lawsuit. And Ashby LLP reviewed a "settlement draft" related to the Sandia lawsuit.

When, as here, appellants attack the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must show that no evidence supports the finding. *Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 839 (Tex. App.—Dallas 2012, no pet.); *see also City of Keller*, 168 S.W.3d at 823 (we review challenge to trial court's ruling on motion for JNOV under legal-sufficiency standard). To the extent that appellants assert that there was no settlement under Contract 1, we disagree.

"[S]ettlement" or "settlement agreement" is defined as "[a]n agreement ending a dispute or lawsuit." *Settlement*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis omitted); *see also Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 860 (Tex. 1999) (citing *Yancey v. Yancey*, 55 S.E.2d 468, 469 (N.C. 1949) ("The word settle means to place in a fixed or permanent condition; to determine. And the word being used in connection with litigation must be understood as signifying that the controversy had been adjusted and brought to an end." (internal quotations omitted))); *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 715 (Tex. App.—Houston

39

[1st Dist.] 1988, writ denied) ("The settlement agreement represented the culmination of the parties' negotiations for the compromise of a dispute.").

Contract 1 states that Ashby LLP was to provide legal representation for Amerjin related to the Sandia lawsuit. It then provides that "[i]n consideration of the services rendered by [Ashby LLP]," Ashby LLP was entitled to forty percent "any and all recovery obtained on behalf of" Amerjin if the Sandia lawsuit is "settled any time before entry of judgment."[18] (Emphasis omitted). The Settlement and Release Agreement that Amerjin and Sandia entered into on August 2, 2011 expressly references the Sandia lawsuit, explaining that Sandia will receive $508,551.39 of the money from the sale of Sandia's pipe in consideration for Sandia and Amerjin both releasing and discharging "any and all manner of claims, liens, liabilities, damages, costs, expenses, and/or causes of action that" Sandia or Amerjin may have had or which may,

> accrue on account of, rising out of, or in any way related to the claims and/or causes of action that were actually asserted in the [Sandia lawsuit] or that could have been asserted therein, known or unknown, and whether arising by contract, under tort law, or by any state or federal statute granting a cause of action.

The Settlement and Release Agreement also provides that, upon receipt of the $508,551.39, Amerjin and Sandia agreed to "file a joint notice of dismissal with

---

[18] The parties do not appear to dispute that the Settlement and Release Agreement was signed before the "entry of judgment" in the Sandia lawsuit.

40

prejudice . . . of all of their claims against each other in the [Sandia lawsuit], known or unknown, and whether arising by contract, under tort law or by any state or federal statute granting a cause of action." Simply put, the Settlement and Release Agreement signed by Amerjin and Sandia constitutes a settlement of the Sandia lawsuit. *See Settlement*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Appellants also assert that Amerjin did not obtain "any recovery" related to the Sandia lawsuit under the Settlement and Release Agreement because it had to "pay money." We again, disagree.

Contract 1 states, related to fees to be paid to Ashby LLP:

> In consideration of the services rendered by [Ashby LLP], [Amerjin] hereby ASSIGNS and CONVEYS to Ashby LLP, as compensation for its service, the following interest in *any and all recovery obtained on behalf of [Amerjin]*:
>
> **40% if settled at any time <u>before entry of judgment</u>;**
> **45% of any settlement or recovery made <u>after entry of a judgment</u>.**
>
> [Amerjin] understands that the interest hereinabove conveyed and assigned is calculated on gross recovery, prior to the deduction of expenses or taxes of any kind.

(Second emphasis added.) "[R]ecovery" is not defined in Contract 1. The primary concern when a court construes a written contract is to determine the parties' true intent as expressed in the contract. *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011); *see also Rodriguez v. Villarreal*, 314 S.W.3d 636, 641 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("A settlement agreement . . . is a contract, and its

41

construction is governed by legal principles applicable to contracts generally.").

When a contract leaves a term undefined, the court presumes that the parties intended its plain, generally accepted meaning. *Epps*, 351 S.W.3d at 866. Often, we consult dictionaries to discern the natural meaning of a common-usage term not defined by the contract. *Id.*

"[R]ecovery" is defined as "[t]he obtainment of a right to something . . . by a judgment or decree." *Recovery*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Joyce Steel Erection, Ltd. v. Bonner*, 506 S.W.3d 58, 63 (Tex. App.—Texarkana 2015, no pet.) ("Recover, in the context of a legal cause of action, means to gain by legal process . . . ." (internal quotations omitted)); *Davis v. Twin City Fire Ins. Co.*, 865 S.W.2d 231, 240 (Tex. App.—Texarkana 1993) (defining recovery as "[t]he amount finally collected" (alteration in original) (internal quotations omitted)), *aff'd as modified on other grounds*, 904 S.W.2d 663 (Tex. 1995).

Here, the Settlement and Release Agreement states that both Amerjin and Sandia claimed ownership of Sandia's pipe. Zhu, however, sold Sandia's pipe for around $1.7 million. Thus, when the parties settled the Sandia lawsuit, Sandia received $508,551.39 of the around $1.7 million that Amerjin gained from the sale of Sandia's pipe, and Amerjin kept the rest.[19] Ashby testified that "recovery,"

---

[19] We note that Amerjin used its portion of the sale proceeds from Sandia's pipe to pay off at least some of its debts and bills.

related to the Sandia lawsuit, as referenced in Contract 1, occurred when there was an agreement between Amerjin and Sandia to settle the Sandia lawsuit and Amerjin obtained a legal right to the $1.2 million that it had ultimately received from the sale of Sandia's pipe "free and clear." In other words, once Amerjin and Sandia signed the Settlement and Release Agreement, under which Amerjin could keep $1.2 million of Sandia's money, "recovery" as for Contract 1 was achieved. According to Ashby, "Amerjin recovered $1.2 million from the settlement" of the Sandia lawsuit. The selling of Sandia's pipe and the recovery by Amerjin of some proceeds from that sale falls under the "any and all recovery" provision of Contract 1. (Internal quotations omitted.)

A JNOV is proper when there is no evidence to support the jury's finding or if a directed verdict would have been proper. TEX. R. CIV. P. 301; *Tiller*, 121 S.W.3d at 713; *B & W Supply, Inc.*, 305 S.W.3d at 15. Such circumstances do not exist here. Thus, based on the arguments that appellants have preserved for appellate review, we hold that the trial court did not err in denying their motions to disregard jury findings and for JNOV on Ashby LLP's breach-of-contract claim.

We overrule appellants' first issue.

## Breach of Fiduciary Duty

In their second issue, appellants argue that the trial court erred in denying their second motion to disregard jury findings and for JNOV on their

breach-of-fiduciary-duty counterclaim against Ashby LLP because Ashby LLP breached its fiduciary duty as a matter of law by not making disclosures to the bankruptcy court required by 11 U.S.C. § 329 and Federal Rule of Bankruptcy Procedure 2016(b) and by misleading the bankruptcy court "to believe it was no longer seeking a 40% contingency (worth $480,000) in connection with the controversy."

As explained, we do not consider unpreserved issues on appeal. *See Fed. Deposit Ins. Corp.*, 361 S.W.3d at 604; *see also Allright, Inc.*, 735 S.W.2d at 240 ("A point of error not preserved, is not before the appellate court for review."). And to preserve a complaint for appellate review, the complaining party must present the complaint to the trial court by timely request, objection, or motion. TEX. R. APP. P. 33.1(a). A party's argument on appeal must comport with the complaint made in the trial court. *See Hussain*, 485 S.W.3d at 174. The complaint raised in the trial court must state the grounds for the ruling sought "with sufficient specificity to make the trial court aware of the complaint." TEX. R. APP. P. 33.1(a); *see also Hussain*, 485 S.W.3d at 174; *Chappell Hill Bank*, 38 S.W.3d at 246–47.

Although appellants did, in their second motion to disregard jury findings and for JNOV, assert that the trial court should disregard the jury's findings on its counterclaim against Ashby LLP for breach of fiduciary duty and enter judgment in their favor on the counterclaim, appellants did not argue that Ashby LLP breached

44

its fiduciary duty as a matter of law by not making disclosures to the bankruptcy court required by 11 U.S.C. § 329 and Federal Rule of Bankruptcy Procedure 2016(b) and by misleading the bankruptcy court "to believe it was no longer seeking a 40% contingency (worth $480,000) in connection with the controversy." Instead, appellants argued that the trial court should disregard the jury's findings and enter judgment in their favor on their breach-of-fiduciary-duty counterclaim because the evidence conclusively established that Ashby LLP obtained a benefit from Amerjin and Ashby LLP breached its fiduciary duty to Amerjin by misrepresenting Contract 4, by not informing Amerjin and Zhu that Ashby LLP would "be paid by the hour," yet also "intend[ing] to take a contingency fee," engaging in self-dealing, taking advantage of appellants' trust, and not disclosing "conflicts of interest."

Thus, we hold that appellants have not preserved for appellate review their argument that Ashby LLP breached its fiduciary duty as a matter of law by not making disclosures to the bankruptcy court required by 11 U.S.C. § 329 and Federal Rule of Bankruptcy Procedure 2016(b) and by misleading the bankruptcy court "to believe it was no longer seeking a 40% contingency (worth $480,000) in connection with the controversy." *See* TEX. R. APP. P. 33.1(a); *see, e.g.*, *Mattar*, 2018 WL 2440382, at *11; *Scarbrough*, 2016 WL 7583546, at *23; *B & W Supply*, 305 S.W.3d at 20; *Lee*, 47 S.W.3d at 776–77; *Brush*, 984 S.W.2d at 725.

## Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Justices Keyes, Goodman, and Countiss.